No. 85,063

ASHLEY IRVIN, a Minor Child, by and through her Parents and
Legal Guardians, DAVID IRVIN and KIM IRVIN, and DAVID
IRVIN and KIM IRVIN, Individually, *Appellants/Cross-appellees*,
v. LINDALL E. SMITH, M.D., *Appellee/Cross-appellant*, and
RICHARD C. GILMARTIN, M.D., *Appellee*.

(31 P.3d 934)

Opinion filed September 21, 2001.

*William J. Skepnek*, of Skepnek Law Firm, P.A., of Lawrence, argued the cause, and *Ted F. Fay*, of the same firm, was with him on the briefs for appellant/cross-appellee.

*Jay F. Fowler*, of Foulston & Siefkin L.L.P., of Wichita, argued the cause, and *Tmothy B. Mustaine* and *Holly A. Dyer*, of the same firm, were with him on the briefs for appellee/cross-appellant Smith.

*Steven C. Day*, of Woodward, Hernandez, Roth & Day, of Wichita, argued the cause and was on the brief for appellee Gilmartin.

The opinion of the court was delivered by

ABBOTT, J.: This is a medical malpractice action arising from an undiagnosed ventriculoperitoneal shunt malfunction which ultimately caused permanent brain damage to Ashley Irvin. Irvin and her parents filed suit against several parties. The district court granted summary judgment in favor of Dr. Richard C. Gilmartin on the basis that there was no physician-patient relationship. All of the other parties have either been dismissed or settled prior to trial, except for the suit against Dr. Lindall E. Smith. The jury returned a defendant's verdict in favor of Smith. Irvin raises several issues on appeal. Smith has also filed a cross-appeal raising two issues.

Irvin was born 6 weeks premature with hydrocephalus, a condition which required the surgical placement of a ventriculoperitoneal or "VP" shunt. The shunt is a pump with a tube. The tube extends from the brain to the abdomen. The purpose of the shunt is to drain excess cerebrospinal fluid from the skull. Once the fluid is drained from the brain, it is reabsorbed into the body through the abdomen. Without the shunt, Irvin would die. With a properly operating shunt, however, a hydrocephalic can live a normal life. The shunt was placed in Irvin at 2 days of age by her neurosurgeon, Dr. Edwin MacGee.

On October 15, 1995, 12-year-old Irvin began experiencing flu-like symptoms and seizures. She also complained of neck and back pain. On October 18, Irvin was transported by life flight from Bob Wilson Memorial Hospital in Ulysses, Kansas, to St. Luke's Hospital in Kansas City, Missouri. At St. Luke's, Irvin was examined by MacGee to determine whether the shunt was working properly. During the 12 years the shunt had been in place, MacGee had performed two other surgeries on the shunt.

On October 19, MacGee determined there was no shunt malfunction. MacGee recalled speaking to an unidentified radiologist about the shunt. The radiologist told him that there was at least 2 inches of shunt tubing remaining in the abdomen. Dr. Karen Divelbiss, who did the official read of the shunt series, reported nothing wrong with the shunt. On October 21, Irvin was discharged and went home. The x-rays taken at St. Luke's, however, revealed

at trial that the distal end of the shunt tubing had pulled up into the abdomen wall due to Irvin's growth, intermittently blocking the flow of cranial fluid into the abdominal cavity.

On October 23, 1995, MacGee wrote Dr. Michael Shull, Irvin's pediatrician in Garden City, Kansas, and told him that the "shunt appeared to be working well."

Irvin's seizures, nausea, vomiting, and neck and back pain soon returned. On November 12, Irvin was admitted to St. Catherine's Hospital in Garden City, Kansas. At St. Catherine's Hospital, Irvin was examined by Shull. Shull worried that the shunt had malfunctioned. X-rays were taken of Irvin's chest and abdomen. The radiologist concluded that no abnormalities were present and reported nothing wrong with the shunt tubing. On November 13, Shull spoke with MacGee regarding Irvin's condition. MacGee indicated that he thought Irvin's shunt was operating correctly and instructed Shull to treat Irvin with hydration and seizure control medication to see if her symptoms would improve. Shull ordered an MRI of the brain to check for increased intracranial pressure caused by the shunt malfunction. The MRI was negative.

Irvin continued to experience nausea, vomiting, neck pain, and seizures on November 13 and 14. On November 14, Shull ordered Irvin to be transported by life-flight from St. Catherine's Hospital to Wesley Medical Center (Wesley) in Wichita, Kansas. Prior to her transfer, Shull spoke with Smith, a pediatric intensivist, at Wesley. Shull and Smith discussed Irvin's condition, history, symptoms, Shull's concern about her seizures, and the possibility of a shunt malfunction. Smith approved the transfer and use of the air ambulance. Shull also ordered additional x-rays.

Smith admitted Irvin at Wesley with x-ray films which showed the outlet or "tip" of her shunt embedded in the muscle of her abdominal wall in a position requiring that it be repaired. Smith testified that he could not remember whether he looked at the x-ray films, however. He admitted that had he looked at the films he would have seen that the shunt needed to be repaired. Smith explained that he could not remember looking at the x-ray films because he was led to believe that a radiologist in Garden City had

already read the x-rays and had concluded that they were "negative." No doctor in Garden City ever looked at Irvin's x-ray films.

On November 14, Smith made a telephone call to obtain a "neurological consult" from Gilmartin, a child neurologist, because Smith thought that Gilmartin was "the best consultant to use to help evaluate Ashley." Gilmartin and Smith discussed performing a shuntogram. A shuntogram is a procedure which involves injection of a radioactive isotope into the shunt to check for shunt blockage. After the consultation, a shuntogram and EEG were ordered for the following morning to be performed by Gilmartin and Smith. Gilmartin and Smith planned to do the shuntogram the next morning because Irvin appeared stable, alert, and conscious between seizures. Neither Smith nor Gilmartin believed that her symptoms indicated an impending shunt malfunction.

The next morning, November 15, Irvin was alert, awake, and verbal. At approximately 8:45 a.m., however, prior to any tests being performed to determine the status of the shunt, Irvin's condition deteriorated, became critical, and required that she be resuscitated and intubated.

At approximately 11:30 a.m., Irvin's condition became worse as her pupils dilated and became unresponsive to light. The shuntogram was finally performed, and it was determined that the shunt was obstructed. Surgery was performed to correct the shunt malfunction.

Prior to undergoing the shuntogram procedure, Irvin suffered permanent and severe brain damage. Specifically, Irvin suffered an ischemic brain injury as a result of lack of oxygen to the brain, which resulted in severe neurological impairment. Irvin was placed on a ventilator on November 15, on which she remained until December 6. Irvin then remained at Wesley until January 5, 1996. Since her discharge, Irvin has received continuous care, treatment, and rehabilitation. Irvin's condition requires that she be fed through a gastrostomy tube. Irvin is unable to walk or speak, is incontinent, and requires full-time care.

Irvin and her parents filed suit in the Sedgwick County District Court against MacGee, Neurology/Neurosurgery P.C., Smith, Gilmartin, and Wesley Medical Center. Irvin subsequently added St.

Luke's Radiological Group, Divelbiss, and Columbia/HCA Health-care Corporation (Columbia). Neurology/Neurosurgery P.C. and MacGee settled early and were dismissed. St. Luke's Radiological Group and its employee Divelbiss (who had moved to Pennsylvania) moved to dismiss for lack of personal jurisdiction. The motion was denied as to St. Luke's but granted as to Divelbiss. Irvin subsequently voluntarily dismissed her claim against St. Luke's.

Gilmartin moved for summary judgment, arguing that he owed no duty to Irvin as there was no physician-patient relationship. The district court agreed and granted summary judgment in favor of Gilmartin.

There have been three jury trials in this matter. The first case was tried in Sedgwick County before a jury in March 1999 against Columbia, Smith, and Wesley. The trial resulted in a directed verdict in favor of Columbia and a hung jury for Smith and Wesley. Irvin subsequently settled her claims against Wesley.

The second jury trial took place in November 1999 in Jackson County, Missouri, and resulted in a verdict of $1,770,391.08 against St. Luke's and Divelbiss. Irvin sought the same damages that were claimed in the Sedgwick County action. Irvin filed a motion for additur or in the alternative a motion for a new trial. The district court granted the motion for a new trial and vacated the verdict. Irvin subsequently settled with St. Luke's and Divelbiss for the full amount of the verdict.

The third jury trial took place in Sedgwick County in January 2000. The only defendant in the third jury trial was Smith. The jury returned a verdict finding no fault on the part of Smith. Irvin filed a motion for a new trial, which was denied by the court. It is from the third jury trial and the dismissal of Gilmartin that this appeal arises. Smith has also filed a cross-appeal in this matter.

## I. SUMMARY JUDGMENT IN FAVOR OF GILMARTIN

Irvin argues that the district court erred in granting summary judgment in favor of Gilmartin by holding that no physician-patient relationship existed between Gilmartin and Irvin.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

Prior to trial, Gilmartin moved for summary judgment, arguing that he owed no duty to Irvin because he had no physician-patient relationship with her. The district court agreed and granted the motion, stating:

"As to Mr. Day's Motion for Summary Judgment, my first reaction in this case is to offer the question as to whether or not a physician/patient relationship existed to the jury as a fact question; certainly [that] is the easiest thing to do. However, it is clear that the courts may and should decide under a number of different fact scenarios on a motion for summary judgment whether or not a physician/patient relationship exists, specifically whether or not such a relationship exists for a consulted physician.

"Now, I'm most concerned with the fact there is an obvious lack of Kansas law on this particular issue. I am willing to look to other jurisdictions for guidance, and I have done as much of my own research as I can also on the matter.

"It seems to me that while the scenarios can vary as to the facts involved and the facts looked at by appellate courts, those cases concerning the existence of a physician/patient relationship look to some facts other than the phone conversation itself, in that there is a contract, the doctor was on call, the doctor offered or gave direction for immediate medical care and treatment that he anticipated would be accepted and was accepted. Did offering to provide—or, I guess, agreeing to provide a further physical exam in the morning and conducting a shuntogram create that further fact that would give rise to a physician/patient relationship on the evening of November 14th? My interpretation of all the prior case law that has been presented in this case directs me in this case that the relationship did not exist until the 15th. The Motion for Summary Judgment is granted."

The plaintiff in a medical malpractice case bears the burden of proof in establishing the elements of the negligence claim. The

existence of the duty of care is dependent on the existence of a physician-patient relationship. See *Reynolds v. Decatur Memorial Hosp.*, 277 Ill. App. 3d 80, 85, 660 N.E.2d 235 (1996) (duty of physician is limited to situations where there is a physician-patient relationship); *Doherty v. Hellman*, 406 Mass. 330, 333, 547 N.E.2d 931 (1989) (plaintiff has the burden to demonstrate existence of physician-patient relationship in order to prove medical malpractice claim); *Millard v. Corrado*, 14 S.W.3d 42, 49 (Mo. App. 1999) (physician-patient relationship is "essential" to medical malpractice claim); *McKinney v. Schlatter*, 118 Ohio App. 3d 328, 332-37, 692 N.E.2d 1045 (1997) (cannot find that physician breached duty where no physician-patient relationship exists); *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex. 1995) (physician cannot be liable for malpractice where there is no physician-patient relationship).

Courts have concluded, as has this court, that whether a physician-patient relationship exists is generally a question of fact for the jury. See *Rule v. Cheesman, Executrix*, 181 Kan. 957, 964-65, 317 P.2d 472 (1957). See also *Dodd-Anderson v. Stevens*, 905 F. Supp. 937, 944 (D. Kan. 1995), *aff'd* 107 F.3d 20 (10th Cir. 1997) (in Kansas, following the *Rule* case, the existence of a physician-patient relationship is a question of fact); *Walker v. Jack Eckerd Corp.*, 209 Ga. App. 517, 524, 434 S.E.2d 63 (1993) (existence of physician-patient relationship is question of fact for jury); *Gallion v. Woytassek*, 244 Neb. 15, 20, 504 N.W.2d 76 (1993) (purview of jury to determine whether physician-patient relationship exists); *Cogswell v. Chapman*, 249 App. Div. 2d 865, 866, 672 N.Y.S.2d 460 (1998) (it is generally a question of fact for the jury whether an implied physician-patient relationship exists); *Tumblin v. Ball-Incon Glass Packaging*, 324 S.C. 359, 365, 478 S.E.2d 81 (Ct. App. 1996) (existence of physician-patient relationship is question of fact for the jury); *Lyons v. Grether*, 218 Va. 630, 633, 239 S.E.2d 103 (1977) (physician-patient relationship is a question of fact).

A physician-patient relationship may be found and summary judgment may be considered, however, "where the facts are shown by such clear, palpable, and undisputed evidence that the jury could reasonably draw but one conclusion." *Walker*, 209 Ga. App. at 524.

Generally, a physician-patient relationship is created only where the physician personally examines the patient. *Millard*, 14 S.W.3d at 49. A physician's indirect contact with a patient, however, does not preclude the finding of a physician-patient relationship. *Adams v. Via Christi Regional Med. Center*, 270 Kan. 824, 835, 19 P.3d 132 (2001). See also *McKinney*, 118 Ohio App. 3d at 336 (lack of direct contact between physician and patient does not preclude the finding of a physician-patient relationship); *Cogswell*, 249 App. Div. 2d at 866 (physician-patient relationship can be established by a telephone call to physician); *Millard*, 14 S.W.3d at 49 (physician-patient relationship may be found even in the absence of contact between the physician and patient); *St. John*, 901 S.W.2d at 424 (physician-patient relationship does not require a formal contract and may be implied by the circumstances). A physician-patient relationship may be found where a physician is contacted by someone on behalf of the patient. *Reynolds*, 277 Ill. App. 3d at 85. Indeed, an implied physician-patient relationship may be found where the physician gives advice to a patient by communicating the advice through another health care professional. *Campbell v. Haber*, 274 App. Div. 2d 946, 946-47, 710 N.Y.S.2d 495 (2000).

A physician who gives an "informal opinion," however, at the request of a treating physician, does not owe a duty to the patient because no physician-patient relationship is created. See *Oliver v. Brock*, 342 So. 2d 1, 4 (Ala. 1976) (no physician-patient relationship found where physician never met with patient, did not even know the patient's name, and merely conversed with treating physician on "gratuitous" basis); *Hill v. Kokosky*, 186 Mich. App. 300, 304, 463 N.W.2d 265 (1990) (opinion directed at treating physician to do with "as he saw fit" does not create physician-patient relationship); *Reynolds*, 277 Ill. App. 3d at 85 (informal opinion from consulting physician at request of treating physician does not create physician-patient relationship); *Lopez v. Aziz*, 852 S.W.2d 303, 306 (Tex. Civ. App. 1993) (physician cannot be liable where he or she merely consulted with treating physician and nothing more). A physician who assumes the role of treating the patient, however, can be liable for medical malpractice. *Tumblin*, 324 S.C. at 365;

*Wheeler v. Yettie Kersting Memorial Hosp.*, 866 S.W.2d 32, 39-40. (Tex. Civ. App. 1993).

In *Adams*, we recently discussed the foundational requirements for the existence of a physician-patient relationship, stating:

"A physician-patient relationship is consensual. Thus, where there is no ongoing physician-patient relationship, the physician's express or implied consent to advise or treat the patient is required for the relationship to come into being. Stated otherwise, the doctor must take some affirmative action with regard to treatment of a patient in order for the relationship to be established." 270 Kan. at 835.

See also *Reynolds*, 277 Ill. App. 3d at 85 (relationship between physician and patient is consensual and is founded in "trust and confidence"); *Millard*, 14 S.W.3d at 49 (relationship is consensual and exists where the patient or someone acting on his or her behalf employs a physician who consents to treat the patient); *Tracy v. Merrell Dow Pharmaceuticals*, 58 Ohio St. 3d 147, 150, 569 N.E.2d 875 (1991) (physician-patient relationship is consensual and may be either implied or an express relationship); *Tumblin*, 324 S.C. at 365 (physician-patient relationship may be established when patient seeks assistance of physician and physician accepts patient).

In the present case, Irvin argues that the undisputed facts show that there was a physician-patient relationship between Gilmartin and Irvin and that the district court erred in granting summary judgment in favor of Gilmartin. The facts, Irvin argues, show that Gilmartin received a lengthy telephone call from Smith during which they engaged in a detailed conversation about the condition, care, and treatment of Irvin. Gilmartin was called because of his experience and expertise as a pediatric neurologist. Gilmartin was not an employee of the hospital and was not "on call" the night he received the phone call from Smith. As a result of the conversation, Gilmartin testified he had a "complete picture of Ashley Irvin's presentation" and that he had surmised that Irvin's condition was "stable." Gilmartin further testified that he and Smith "jointly developed a plan for the evaluation of Ashley Irvin" and that he assumed primary responsibility for performing the shuntogram tests the next day.

Before receiving a call from Smith on November 14, 1995, Gilmartin had never had contact with Irvin or her family and had no

involvement of any kind in her medical care. Clearly up to that point, there was no physician-patient relationship. Gilmartin was not "on call" on November 14, 1995, and was subject to no contractual obligation which would require him to attend any patients at Wesley.

During the evening of November 14, 1995, Smith called Gilmartin and asked him to perform a consultation on Irvin. The working diagnosis at the time was new onset seizure disorder, with concern over possible shunt malfunction. The two doctors discussed the case and it was agreed that Gilmartin would see the patient the next morning, carry out a formal consultation, and assist in conducting the diagnostic test known as a shuntogram. Gilmartin's position is that he had no duty as a physician until he assumed a physician-patient relationship with Irvin on the morning of November 15, 1995. Without a legal duty, there can be no compensable negligence.

Whether a physician owes a legal duty to a patient under a particular circumstance is a question of law. It is not a question of fact or of negligence. Absent the existence of a physician-patient relationship, there can be no liability for medical malpractice.

The mere act of a physician agreeing to see a patient at a later time does not begin the relationship. Nor does the fact that a plaintiff produces an expert witness who will testify that a particular act or omission constitutes "a departure from the standard of care" establish that a duty exists as a matter of law. See, e.g., *Calwell v. Hassan*, 260 Kan. 769, 925 P.2d 422 (1996). Actionable negligence must be based upon breach of duty. *Honeycutt v. City of Wichita*, 251 Kan. 451, 463, 836 P.2d 1128 (1992); *Hackler v. U.S.D. No. 500*, 245 Kan. 295, 297, 777 P.2d 839 (1989). Whether a legal duty exists is a question of law. *Calwell*, 260 Kan. at 777; *Boulanger v. Pol*, 258 Kan. 289, 298, 900 P.2d 823 (1995). See *Dodd-Anderson*, 905 F. Supp. at 945-46. Whether the duty has been breached becomes a question of fact for the jury. However, when the controlling facts are not at issue, the question becomes one for the court. Without a duty, there can be no breach. See *Calwell*, 260 Kan. at 777-78, 789.

Here, the sole involvement of Gilmartin was as a private practitioner who had been asked to carry out a consultation the following day. The formal consultation refers to a full bedside review of the case which includes a physical examination of the patient. At the time Gilmartin spoke with Smith, Gilmartin had not examined Irvin, had not reviewed her hospital chart, and had never spoken with either her or her parents. The only information he had was what he had been told by Smith. There is no claim that Gilmartin entered any orders in the case or took any other action other than discussing the case in general terms with Smith and agreeing to consult the next day. This, by itself, does not create a physician-patient relationship.

This case, to a large extent, boils down to public policy concerns. The type of telephone conversation that took place here takes place on a frequent basis in the medical profession and is vital to the treatment of patients. For the courts to discourage such conversations is not to the patients' or the public's best interests.

## II. PHYSICIAN-PATIENT RELATIONSHIP

Courts have used great caution when responding to requests that they recognize legal duties within this medically important but legally ambiguous world of the curbside consultation. Indeed, the published decisions are unanimous in agreeing that extension of the physician-patient relationship to include this type of informal consultation would be contrary to public policy. "Imposition of liability under these circumstances would not be prophylactic but instead counter-productive by stifling efforts at improving medical knowledge. *Rainer v. Grossman*, 31 Cal. App. 3d 539, 544, 107 Cal. Rptr. 469 (1973). See *Hill*, 186 Mich. App. at 303-06; *Lopez*, 852 S.W.2d at 307. A good expression of these public policy concerns appears in *Reynolds*, 277 Ill. App. 3d at 86, as follows:

"Plaintiffs suggest that what needs to be done is to find a physician-patient relationship to result from every such conversation. The consequence of such a role would be significant. It would have a chilling effect upon practice of medicine. It would stifle communication, education and professional association, all to the detriment of the patient. The likely effect in adopting plaintiffs' argument also would be that such informal conferences would no longer occur."

Courts have taken these public policy concerns to heart and have routinely refused to extend liability for medical malpractice to doctors who have acted solely in the role of an informal or curbside consultant. This has been true even when the doctors' involvement in giving advice to the attending physician has been very extensive. In *NBD Bank v. Barry*, 223 Mich. App. 370, 566 N.W.2d 47 (1997), for example, the patient's attending physician, Dr. Miller, contacted the defendant, Dr. Barry, "on multiple occasions" asking his opinion of the patient's case. Not only did Barry discuss the case and make recommendations to Miller, he apparently even reviewed the chart once with Miller. However, Barry did not formally consult on the case and never contacted or examined the patient. In upholding summary judgment for Barry, the court concluded that contacts with Miller fell into the context of an informal consultation which did not create a physician-patient relationship with the patient. 223 Mich. App. at 372-73. Absent such a relationship, Barry owed no duty of care to the patient. While he had offered opinions to Miller, these "were simply recommendations that Miller was free to accept or reject." 223 Mich. App. at 373.

The same result was reached in *Reynolds*, 277 Ill. App. 3d 80, a case with facts strikingly similar to the present case. There, a young boy who came to the emergency room had a history of falling at home. A pediatrician, Dr. Bonds, was called to the emergency room and assessed the child. The child had a fever of 102 degrees. At this point, Bonds called a colleague, Dr. Fulbright, and gave him a run down on the child's condition. Fulbright asked if the child had a stiff neck; Bonds checked and reported that he did. At the conclusion of the conversation, Fulbright recommended that a spinal tap be performed to rule out meningitis or a similar infectious process; this was done by Bonds. Unfortunately, the child was ultimately found to have had a spinal cord injury as opposed to an infectious process. His injuries left him permanently quadriplegic. The plaintiffs' expert witnesses in the case alleged that Fulbright had been negligent in making recommendations without first examining the patient. In rejecting this claim, the trial court granted summary judgment to Fulbright. On appeal, the court upheld the summary judgment concluding that there was no evidence that

Fulbright had ever developed a physician-patient relationship with the patient. 277 Ill. App. 3d at 85, 87. Of particular importance to this case, the court concluded that the law does not "require a physician to enter into a physician-patient relationship with every person treated in the hospital whose treating physician might make an informal inquiry about that case." 277 Ill. App. 3d at 86. See *Schrader v. Kohout*, 239 Ga. App. 134, 522 S.E.2d 19 (1999); *Hill*, 186 Mich. App. 300; *Flynn v. Bausch*, 469 N.W.2d 125 (Neb. 1991); *St. John*, 901 S.W.2d 420; 1 Louisell & Williams, Medical Malpractice § 8.03 at 8-19, 8-20 (Matthew Bender 2001).

We conclude that Gilmartin was under no legal duty to go to the hospital on November 14, 1995; thus, his failure to do so cannot constitute a breach of duty to support a claim of negligence.

### III. DR. RADETSKY'S TESTIMONY

Irvin argues that the district court erred in allowing Dr. Michael Radetsky, a pediatric intensivist, to testify that Smith did not violate the standard of care because Radetsky's testimony was outside the scope of Smith's expert designation and because Radetsky had refused to answer specific questions regarding the existence of such opinion during his discovery deposition.

The admission of expert testimony lies within the sound discretion of the trial court. Its decision will not be overturned absent an abuse of such discretion. *Olathe Mfg., Inc. v. Browning Mfg.*, 259 Kan. 735, 762, 915 P.2d 86 (1996). One who asserts an abuse of discretion bears the burden of showing such abuse. *State v. Mullins*, 267 Kan. 84, 93, 977 P.2d 931 (1999).

Irvin argues that Smith was required to disclose Radetsky's opinions and the summary of the grounds for his opinions pursuant to K.S.A. 2000 Supp. 60-226(b)(6)(B). Because Smith failed to provide a report in which Radetsky offered his opinions regarding the standard of care of Smith, Irvin argues that his testimony should not have been admitted.

Radetsky was initially retained as an expert by Wesley to testify regarding the standard of nursing care provided to Irvin. After Wesley was dismissed, Smith asked Radetsky to testify in the second Sedgwick County trial.

At the time of Radetsky's discovery deposition, his counsel stated: "He's not going to express any opinions at trial concerning the physicians in this case." When counsel for Irvin attempted to elicit Radetsky's opinions concerning the care of Smith, Radetsky's counsel reiterated: "He will not render any testimony whatsoever concerning the standard of care issues concerning any of the physicians involved with this case, either Wesley or anywhere else, period." Smith's counsel also joined with Radetsky's counsel, stating: "Dr. Radetsky did not render a report as to Dr. Smith . . . . But as I understand what Mr. North said . . . the witness is not being offered on those subject matters beyond the scope of the report." Irvin's counsel persisted and asked: "Okay, Dr. Radetsky, what opinions do you have concerning the care rendered by Dr. Smith?" Radetsky's counsel again objected, stating: "No. Objection. It's beyond the scope of his expert report. He's not going to be offered as a witness at trial so he's not going to answer the question." Radetsky did not answer the question during the deposition.

During the course of the trial, Smith offered the testimony of two "standard of care" witnesses, Dr. George Reynolds and Radetsky. Reynolds had been designated and deposed as a standard of care expert for Smith. As previously noted, Radetsky initially had been designated and deposed as an expert witness whose opinions related to the nursing care provided by Wesley.

Early in the trial, Smith informed Irvin of his witness schedule, which included Radetsky. Irvin objected to the use of Radetsky as a standard of care witness several times. Smith informed the court that Radetsky would essentially provide the same testimony that he provided in the March 1999 trial, but that Radetsky would not be asked to comment on Smith's standard of care.

At trial, Radetsky testified via videotaped deposition. Radetsky testified that records and testimony showed nothing to indicate a shunt malfunction prior to 8:45 a.m. on November 15, 1995. Both Irvin and Smith filed designations of Radetsky's testimony. Irvin objected to the introduction of Radetsky's videotaped trial deposition. The district judge overruled the objection, stating:

"This witness testified at the last trial, he's testified again at videotaped deposition on areas that I'm pretty confident are basically the areas that you covered the first time you had this trial. More importantly, he was listed as a witness by Doctor Smith in the pretrial order. I think that his testimony should be allowed in this case."

Irvin cannot claim surprise or prejudice by the district court's decision to allow Radetsky to testify in this matter.

Contrary to Irvin's assertions, Smith designated Radetsky as an expert in the pretrial order when he set forth and identified any "expert witnesses named by other defendants" in his witness list. Because Wesley had originally named Radetsky as an expert witness, Smith was able to call him as an expert in the second trial as the district court had previously ruled that witnesses listed by one party could be called by any other party.

Radetsky was questioned at length by Irvin during the discovery deposition on matters relating to the standard of care of Irvin; although the questions did not specifically mention or refer to Smith, they, nonetheless, shed light on Radetsky's opinions regarding the care provided to Irvin.

A thorough examination of the voluminous record reveals that Radetsky's testimony in the videotaped deposition taken during the second trial roughly mirrors that of the discovery deposition Radetsky gave prior to the first trial and is also similar to the testimony Radetsky provided at the first Sedgwick County trial. Furthermore, Radetsky's testimony at the second trial was consistent with the content of his report made for Wesley.

We cannot say the district court abused its discretion in allowing Radetsky to testify regarding Smith's standard of care.

## IV. PURCHASE OF ANNUITY

Irvin next argues that the district court erred in allowing Smith to present testimony regarding the hypothetical purchase of an annuity as a way to convert future damages into present value. Irvin specifically argues that the annuity evidence is violative of the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and that evidence of the purchase of a hypothetical annuity violates public policy.

Because the jury found that Smith was not liable for Irvin's damages as he did not breach his duty of care, the issue of damages is moot. Irvin alleges, however, that the jury's perception of Irvin's credibility hinged on the damage testimony. Irvin originally claimed over $20 million dollars in damages. The court allowed testimony through the insurance agents who estimated that $20 million in damages could be covered by the purchase of a $3 million annuity. The reduction from the amount originally requested to a fraction of the original amount, Irvin argues, prejudiced the outcome of the trial by tipping the scales towards finding that Smith committed no breach of duty. Irvin does not provide any evidence indicating that the presentation of the annuity evidence had an adverse effect other than conjecture and suspicion. Irvin's argument is untenable and without support. The issue is moot.

## V. EXHIBIT 56 (DAMAGES FOR FUTURE INSTITUTIONAL CARE)

Irvin argues that the district court erred when it reversed its prior ruling on the foundation of Exhibit 56 by amending Irvin's request for damages for future institutional care.

As with the previous issue, any question regarding the admission of damage evidence was rendered moot when the jury returned a verdict finding that Smith had not breached his duty of care toward Irvin. Irvin has not shown how the claimed error affected the outcome of the liability portion of the trial. Having shown no prejudice, any error must be "harmless."

## VI. ORDERING IRVIN TO APPEAR AT VOIR DIRE

Irvin argues that the district court erred in ordering Irvin to appear at voir dire and precluding her from appearing during any other portion of her trial if she did not appear during voir dire.

This same issue arose when the case was first tried in March 1999 in Sedgwick County. Irvin was subpoenaed by Smith to appear in person on the first day of trial during jury selection. Although Irvin moved to quash the subpoena, the district court ordered her to appear in person, which she did.

Prior to the second Sedgwick County trial, Smith caused a subpoena to be issued to Irvin directing her appearance during the voir dire of the jury pursuant to K.S.A. 2000 Supp. 60-245. K.S.A. 2000 Supp. 60-245(a)(1)(C) sets forth that: "[Every subpoena shall] command each person to whom it is directed to attend and give testimony or to produce and permit inspection and copying of designated books . . . in the possession . . . of that person . . . ."

Irvin and her family moved to quash the subpoena claiming, among other things, lack of statutory subpoena power and undue hardship to Irvin. The district court ordered the Irvin family to produce Irvin in the courtroom during voir dire. The district court ruled that if Irvin was not produced at voir dire, she would be barred from the courtroom throughout the trial. Irvin did not appear in person during her trial.

Irvin argues again on appeal that Smith did not have the authority to issue a subpoena compelling her to appear at voir dire because "she is not capable of giving testimony nor is she capable of possessing documents."

Smith wanted Irvin present at voir dire so that the potential jury members could assess their feelings of her and so that counsel would have the opportunity to assess whether particular jurors would be able to make a fair and just decision given Irvin's physical condition. The purpose of voir dire is to select jurors who are without bias, prejudice or partiality. *State v. Aikins*, 261 Kan. 346, 365, 932 P.2d 408 (1997); *State v. Hayes*, 258 Kan. 629, 631, 908 P.2d 597 (1995). The nature, scope, and manner of the voir dire examination lie within the sound discretion of the trial court. *State v. Jorrick*, 269 Kan. 72, 77, 4 P.3d 610 (2000); *State v. Shannon*, 258 Kan. 425, 433, 905 P.2d 649 (1995). The trial court has a duty to see that the jury is comprised of fair and impartial persons. *State v. Stuart*, 206 Kan. 11, 12, 476 P.2d 975 (1970).

We cannot say the district court abused its discretion in ordering Irvin to be present at voir dire.

## VII. NEW TRIAL

Irvin argues that the district court erred in refusing to grant the motion for a new trial because the verdict was contrary to the evidence.

When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of an appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. *Cerretti v. Flint Hills Rural Electric Co-op Ass'n,* 251 Kan. 347, 361-62, 837 P.2d 330 (1992); *Wisker v. Hart,* 244 Kan. 36, 37, 766 P.2d 168 (1988).

Following the verdict, Irvin filed a motion for a new trial. The district court denied the motion. Irvin argues that the verdict finding that Smith had not breached his duty was contrary to the evidence because the evidence shows that Smith did not remember whether he had looked at Irvin's x-rays on November 14. The testimony also shows, Irvin argues, that Smith should have looked at Irvin's x-rays and that Smith admits that if he would have looked at them he would have concluded that the shunt was imbedded in the abdominal cavity.

Smith argues, on the other hand, that there was ample evidence to support the jury verdict. Dr. George Reynolds testified for Smith concerning the standard of care. Reynolds testified that Smith did not depart from the standard of care, stating:

"My opinion is that Doctor Smith acted appropriately and that the care he gave Ashley was within the standard of care.

. . . .

". . . I was asked to look at what Doctor Smith did based on the information he had available. I don't think there's any question that he got bad information. He was told that she—that her shunt had been cleared by her neurosurgeon, that they had done an appropriate workup and it was negative. He had been told that a shunt series was in progress and that he would know if it was—if there is any abnormality. So he had reason to believe he was going to be notified. He knew the . . . MRI . . . at St. Catherine's was normal; not once but twice. There's no acute process, there's no evidence of increased intracranial pressure is what we can reasonably infer from that. Given the bad information he had, he did the best he could with the information available to him. I think he acted appropriately."

When questioned by Irvin's counsel, Reynolds again reiterated that he believed Smith did not breach his duty to Irvin. During cross-examination, the following took place:

"Q. You believe that the standard applied to Doctor Smith is that Doctor Smith is not at fault in Ashley's injury?
"A. I believe—applying the standards as I understand them, that's the conclusion I reach, yes."

When further questioned, Reynolds further maintained that Smith did not depart from the appropriate standard of care.

"Q. You disagree—I say that Doctor Smith's negligence caused or contributed to cause Ashley's injury.
"A. I absolutely disagree with that."

Furthermore, the jury heard testimony that Smith knew that Irvin's shunt had been cleared by her neurosurgeon in Kansas City 3 weeks earlier. Irvin appeared to be ill and did not present symptoms of shunt malfunction. MacGee reported that Irvin's shunt was fine 3 days prior to her arrival at Wesley. Irvin's MRI from St. Catherine's showed no increased intracranial pressure. There was also testimony indicating that Gilmartin believed that the shuntogram could be done the next day as Irvin was in stable condition on the night of November 14.

The jury was also presented with other evidence to suggest that there were others who contributed to Irvin's injury. The jurors watched the videotaped deposition of MacGee where he stated that a radiologist had told him the tubing was fine, but he could not remember who the radiologist was. Divelbiss admitted that her readings of the x-rays were incorrect. Irvin furthermore stipulated that Divelbiss and MacGee were partially at fault.

It is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. The evidence, when considered in the light most favorable to Smith, supports the verdict and will not be disturbed on appeal.

Both of the cross-appeal issues are moot by virtue of the above decision.

Affirmed.

LOCKETT, J., dissenting: I respectfully dissent from the majority's affirmance of the district court's grant of summary judgment to Dr. Gilmartin. Without noting the various types of physician consultants, the majority creates a broad public policy physician-

consultant exception to the physician-patient relationship by stating a "physician cannot be liable for medical malpractice where he or she merely consulted with a treating physician and nothing more." 272 Kan. 112, Syl. ¶ 5.

The majority recognizes that summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the appellate court applies the same rules, and where it finds reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. See *Bergstrom v. Noah,* 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

The facts stated by the majority are that during the evening of November 14, 1995, Dr. Smith called Gilmartin and asked him to consult on Irvin's case. The working diagnosis at the time was new onset seizure disorder, with concern over possible shunt malfunction. The two doctors discussed the case and it was agreed that Gilmartin would see the patient the next morning, carry out a formal consultation, and assist in conducting the diagnostic test known as a shuntogram. Gilmartin's position is that he had no duty as a physician until he assumed a physician-patient relationship with Irvin on the morning of November 15, 1995, and, without a legal duty, there can be no compensable negligence.

The majority asserts that the sole involvement of Gilmartin was as a private practitioner who had been asked to carry out a formal consultation the following day. The majority states that a formal consultation requires (1) a full bedside review of the case and (2) a physical examination of the patient. The majority notes that at the time Gilmartin spoke with Smith, Gilmartin had not examined

Irvin, had not reviewed her hospital chart, and had never spoken with her or her parents. The only information he had was what Smith had told him. The majority observes that there is no claim that Gilmartin entered any orders in the case or took any other action other than discussing the case in general terms with Smith and agreeing to "formally" consult the next day.

After disregarding facts favorable to the plaintiff and our prior law that the creation of the physician-patient relationship is a question of fact, the majority reveals its intent to create public policy by stating: "This case, to a large extent, boils down to public policy concerns. The type of telephone conversation that took place here takes place on a frequent basis in the medical profession and is vital to the treatment of patients. For the courts to discourage such conversations is not to the patients' or the public's best interests." 272 Kan. at 123. The majority further states: "Courts have taken these public policy concerns to heart and have routinely refused to extend liability for medical malpractice to doctors who have acted solely in the role of an informal or curbside consultant." 272 Kan. at 124. Then, the majority makes a contradictory assertion: "This has been true even when the doctors' involvement in giving advice to the attending physician has been very extensive." 272 Kan. at 124.

Citing *Millard v. Corrado*, 14 S.W.3d 42, 49 (Mo. App. 1999), the majority asserts that generally, a physician-patient relationship is created only where the physician personally examines the patient. The majority then acknowledges our contrary statement in *Adams v. Via Christi Regional Medical Center*, 270 Kan. 824, 835, 19 P.3d 132 (2001), that a physician's indirect contact with a patient does not preclude the finding of a physician-patient relationship. The majority acknowledges that a physician-patient relationship does not require a formal contract and may be implied by the circumstances. It notes that a physician-patient relationship may be found where a physician is contacted by someone on behalf of the patient. The majority states that an implied physician-patient relationship may be found where the physician gives advice to a patient by communicating the advice through another health care professional. 272 Kan. 112, Syl. ¶ 4.

Ignoring the law it has just acknowledged, the majority asserts that a physician who gives an informal opinion at the request of a treating physician does not owe a duty to the patient because no physician-patient relationship is created. It points out that a physician cannot be liable where he or she merely consults with a treating physician and nothing more.

Then, to reach its public policy decision, the majority disregards the Kansas statutory rule for granting summary judgment, the existence of facts favorable to the plaintiff, and prior Kansas case law regarding the question of whether a physician-patient relationship exists, concluding that Gilmartin was under no legal duty to go to the hospital on November 14, 1995; thus, his failure to act cannot constitute a breach of duty to support a claim of negligence. 272 Kan. at 125.

Irvin argues to this court that the district court erred in granting summary judgment to Gilmartin. Irvin asserts that the undisputed facts show that a physician-patient relationship existed between Gilmartin and Irvin. The record on appeal shows that Gilmartin was called by Irvin's treating physician, Smith because of Gilmartin's experience and expertise as a pediatric neurologist. Gilmartin was not an employee of the hospital and was not "on call" the night he received the phone call from Smith. Gilmartin and Smith had a detailed conversation about the condition, care, and treatment of Irvin. The majority fails to take into account Gilmartin's testimony that during the telephone conversation Gilmartin and Smith "jointly developed a plan for the evaluation of Ashley Irvin," and Gilmartin agreed to assume primary responsibility for performing the shuntogram tests the next day.

Plaintiff's two expert witnesses each testified that such a detailed consultation often occurs in the course of a telephone call between physicians. The experts stated that by discussing the case with Smith and jointly formulating a treatment plan and agreeing to perform the shuntogram test the next day, Gilmartin established a physician-patient relationship with Irvin and, therefore, Gilmartin owed a duty to Irvin. Plaintiff's experts stated that the conversation between the two physicians provided Gilmartin a "complete picture of Ashley Irvin's presentation," and Gilmartin incorrectly sur-

mised that Irvin's condition was "stable" and negligently delayed Irvin's shuntogram procedure until the next day.

In *Adams*, we recently discussed the foundational requirements for the existence of a physician-patient relationship, stating:

"A physician-patient relationship is consensual. Thus, where there is no ongoing physician-patient relationship, the physician's express or implied consent to advise or treat the patient is required for the relationship to come into being. Stated otherwise, the doctor must take some affirmative action with regard to treatment of a patient in order for the relationship to be established." 270 Kan. at 835.

Most confusing is the majority's broad statement that a physician who gives an "informal opinion" at the request of a treating physician does not owe a duty to the patient because no physician-patient relationship is created. 272 Kan. at 120. The majority fails to note the difference between an "informal opinion" and a "formal opinion." It also fails to recognize that there are consulting physicians whose role in a patient's case is limited to offering an opinion or suggestion to the treating physician and there are consulting physicians who advise treating physicians by aiding them in formulating a treatment plan for the patient.

In reaching its public policy decision, the majority relies on *Reynolds v. Decatur Memorial Hosp.*, 277 Ill. App. 3d 80, 660 N.E.2d 235 (1996). The majority states that the facts in *Reynolds* are strikingly similar to the facts of the present case. I disagree.

In *Reynolds*, the examining physician telephoned a second physician at home seeking advice on diagnosing a child, and the second physician's only participation in the treatment of the child was his suggestion that a particular test be conducted to rule out certain illnesses. The first physician allegedly misdiagnosed the child's illness, and the second physician was made a defendant in the medical malpractice lawsuit.

The *Reynolds* court held that there was no physician-patient relationship between the second physician and the patient, nor any duty owed by that physician, because he gave an "informal opinion" at the request of the treating physician. 277 Ill. App. 3d at 85. The Illinois court noted that *Reynolds* was not a case where a physician was asked to provide a service for the patient, conduct laboratory tests, or review test results; the physician "did nothing more than

answer an inquiry from a colleague." 277 Ill. App. 3d at 85. The Illinois court distinguished the case from one where a physician accepts a referral of the patient. 277 Ill. App. 3d at 85.

The majority fails to note that 2 years later, in *Bovara v. St. Francis Hospital*, 298 Ill. App. 3d 1025, 1030-33, 700 N.E.2d 143 (1998), a case factually similar to our case, the Illinois court limited *Reynolds* and reversed a trial court's grant of summary judgment, holding that genuine issues of material fact existed as to whether two physicians owed a duty of care to the patient. It noted that at the request of the patient's cardiologist, the consulting physicians had reviewed the patient's angiogram film and communicated to the cardiologist that the patient was a candidate for coronary angioplasty. The *Bovara* court noted that while the consulting physician in *Reynolds* had suggested a test and was not responsible for any portion of the patient's diagnosis or treatment, the doctors in this case reviewed the patient's test results and interpreted them. The *Bovara* court found an analogy between its facts and cases where a radiologist or a pathologist, who have no actual contact with patients, enter into a physician-patient relationship when they perform a service for the care and treatment of a patient. 298 Ill. App. 3d at 1030-31. In reaching its decision, the Illinois court reasoned:

"Similarly, a trier of fact might conclude that Drs. Bliley and Edgett [consulting physicians] performed a service for Bovara as part of a CRC team of physicians. Drs. Pascale [primary physician], Bliley and Edgett were employees and associates of St. Francis Hospital and CRC. Drs. Bliley and Edgett knew or should have known that Dr. Pascale was not trained to read angiograms and did not perform angioplasty operations. *The trier of fact may find that, when they received the angiogram that came from Dr. Pascale, they knew or should have known that their medical opinion would be passed on to the patient by Dr. Pascale.* If their medical opinion would have been that Bovara was not a candidate for an angioplasty operation, it was probable that there would not have been an angioplasty operation. On the other hand, if their medical opinion was that Bovara was a candidate for an angioplasty operation, it was probable that Dr. Pascale would inform Bovara that he could have an angioplasty procedure. *In any event, the trier of fact could find that Drs. Bliley and Egett knew or should have known that their medical opinion was crucial to Bovara.*" (Emphasis added.) 298 Ill. App. 3d at 1031.

The majority also relies on *NBD Bank v. Barry*, 223 Mich. App. 370, 566 N.W.2d 47 (1997), to support its premise that where a

consulting physician engages in informal consultations with the treating physician, the consulting physician owes no duty of care to the patient. While I would not disagree with the premise, I note that the *NBD* court relied on and quoted from an earlier Michigan case, *Hill v. Kokosky*, 186 Mich. App. 300, 463 N.W.2d 265 (1990), which stated:

" 'Neither defendant knew, examined, or spoke with plaintiffs. [The patient] was not referred to defendants for treatment or consultation. Plaintiffs did not employ defendants, nor did they seek medical advice or treatment from defendants. Defendants' medical opinions were addressed directly to [the treating physician] as a colleague, and not indirectly to plaintiffs as patients. The opinions were not in the nature of a prescribed course of treatment, but were recommendations to be accepted or rejected by Dr. Hole as he saw fit.' [186 Mich. App. at 304.]" *NBD*, 223 Mich. App. at 372-73.

Based on these facts, the *NBD* court concluded the consulting physician simply recommended a course of treatment that the treating physician was free to accept or reject, the consulting physician did not agree to treat the patient or to be a consultant on the case, and the consulting physician did not owe a duty of care to the patient. 223 Mich. App. at 373.

Both *Reynolds* and *NBD* are factually distinguishable from this case. Here, Gilmartin knew that his advice to Smith would directly affect Smith's course of treatment of Irvin and Gilmartin agreed to personally perform the shuntogram. In addition, Gilmartin not only gave medical advice and options to Smith, but also Gilmartin agreed to assist with the treatment of Irvin. Gilmartin's decision to delay the shuntogram until the next day had a direct impact on Irvin's treatment and, consequently, her injury.

I find the reasoning in *Diggs v. Arizona Cardiologists, Ltd.*, 198 Ariz. 198, 8 P.3d 386 (Ct. App. 2000), to be persuasive. After an emergency room physician consulted with the cardiologist, he released the patient who died of a heart attack 3 hours later. The *Diggs* court found that the cardiologist who informally consulted with the emergency room physician owed a duty of care to the patient brought to the hospital with severe chest pain. It noted that the lack of an express contractual physician-patient relationship between the cardiologist and the patient was not dispositive. It then

observed that only the cardiologist had.the expertise to interpret the echocardiogram to rule out myocardial infarction on the basis of the electrocardiogram and determine further treatment. 198 Ariz. at 201-02.

The *Diggs* court reasoned that the cardiologist was in a unique position to prevent further harm to the patient. The cardiologist, with his superior knowledge and experience, was in the best position to correct any error in the emergency room doctor's diagnosis. 198 Ariz. at 202. In reaching its conclusion, the *Diggs* court relied on Restatement (Second) of Torts § 324A (1965), which provides:

" 'One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or . . . (c) the harm is suffered because of reliance of the other or third person upon the undertaking.'

Thus, if an actor's negligent undertaking 'results in increasing the risk of harm to a third person, the fact that he is acting under a . . . gratuitous agreement with another will not prevent his liability to the third person.' [Citation omitted.] Additionally, '[w]here the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such risk, the harm results from the negligence as fully as if the actor had created the risk.' [Citation omitted.]" 198 Ariz. at 202.

The *Diggs* court, taking the undisputed facts and all inferences therefrom in a light most favorable to Diggs, found that the consulting doctor undertook to provide his expertise to the treating physician, knowing that it was necessary for the protection of Diggs and that the treating physician would rely on it. The treating physician needed the specialized knowledge of the expert. The record indicated that the treating physician did not exercise independent judgment as to Diggs' diagnosis; rather, he subordinated his professional judgment to that of the specialist. The court concluded that the specialist effectively became a provider of medical treatment to Diggs and that relationship gave rise to a duty of reasonable care. 198 Ariz. at 202-03.

"Consult" is a broad term meaning to seek advice or information; to refer to; to keep in mind or consider; to exchange views or confer; to give professional advice. A "consultant" is one who gives expert or professional advice or one who consults another. "Consultation" is the act or procedure of consulting; a conference at which advice is given or views are exchanged. Webster's II New Riverside University Dictionary 303 (1988).

I do not disagree with the majority's statement that where a physician-patient relationship exists, as a matter of law the physician owes a duty of care to the patient; where a physician-patient relationship does not exist, the physician owes no duty of care. 272 Kan. at 119-20. However, whether a physician-patient relationship exists is a question of fact for the jury. See *Rule v. Cheesman, Executrix*, 181 Kan. 957, 964-65, 317 P.2d 472 (1957).

To reach its conclusion, the majority characterized Gilmartin's involvement as an informal consultant and cites the public policy of encouraging physicians to converse with other physicians regarding patient care. To reach its goal, the majority ignores the fact that Gilmartin's involvement was more than informal. It was Gilmartin's assessment and recommendations for care that directly influenced the course of Irvin's treatment. Gilmartin, in consultation with Smith, determined that a shuntogram was necessary and agreed to perform the shuntogram the next day. These facts indicate a physician-patient relationship. During the telephone conversation, it was Gilmartin and Smith's decision to wait until the next day to perform the shuntogram on Irvin. The decision to delay medical treatment caused Irvin's injuries. Under our present law, Gilmartin should not be relieved of his physician-patient relationship merely because he had not yet met Irvin. The decision that delayed the care and treatment of Irvin until the next morning was based on Gilmartin's experience and expertise.

The district court's grant of summary judgment to Gilmartin should be reversed. Gilmartin's actions on the night of November 14 and his agreement to perform the shuntogram on Irvin the next day are sufficient facts to submit to the jury the question of whether Gilmartin had a physician-patient relationship with Irvin.

ALLEGRUCCI, J., joins in the foregoing dissenting opinion.