WEAVER v UNIVERSITY OF MICHIGAN BOARD OF REGENTS

Docket No. 132952. Submitted April 6, 1993, at Detroit. Decided
August 16, 1993, at 9:55 A.M.

Marguerite Weaver, as next friend of Bobbie Weaver, a minor,
brought a medical malpractice action in the Court of Claims
against the University of Michigan Board of Regents, which
operates the University of Michigan Medical Center. Bobbie
had been treated by a neurosurgeon at the medical center and
examined there periodically until October 1982. Bobbie's treat-
ment and medical records were then transferred to another
neurosurgeon, not associated with the medical center. In Febru-
ary 1987, Bobbie began experiencing problems, and her current
neurosurgeon examined her and concluded that no emergency
existed, but recommended that a second opinion be obtained
from the medical center. Bobbie's father called the medical
center and made an appointment. On the day of the appoint-
ment, the surgeon who originally treated Bobbie, examined her
and performed emergency surgery, but she suffered a perma-
nent and nearly total loss of vision. The court, Thomas L.
Brown, J., granted summary disposition for the defendant,
determining that the telephone call by Bobbie's father to a
secretary in the medical center, during which the appointment
for Bobbie's medical examination was set, did not revive the
previously terminated physician-patient relationship between
Bobbie and the medical center staff and that in the absence of
such a relationship no liability can be ascribed to the defen-
dant. The plaintiff appealed.

The Court of Appeals *held*:

A telephone call made for the purpose of scheduling an
appointment with a physician does not by itself establish a
physician-patient relationship where, as here, the caller, or the
person on whose behalf the call is made, has no ongoing
relationship with the physician and does not seek or obtain
medical advice during the conversation.

Affirmed.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by
*David R. Getto, Norman D. Tucker,* and *Ann M.
Schoepfle*), for the plaintiff.

*Boothman, Hebert, Eller & Yockey, P.C.* (by *Dale L. Hebert*), for the defendant.

Before: Hood, P.J., and Brennan and Corrigan, JJ.

Corrigan, J. In this medical malpractice action, plaintiff appeals the grant of summary disposition to defendant pursuant to MCR 2.116(C)(10). We affirm.

Plaintiff was diagnosed as hydrocephalic when she was six months old. In hydrocephalus, the normal flow of cerebrospinal fluid around the brain is impaired. If the condition remains untreated, permanent brain damage usually results. Plaintiff's condition was treated by the insertion of a shunt that drained the excess fluid from the area around the brain. The shunt was implanted in October 1980 by Dr. Dauser, a pediatric neurosurgeon associated with the University of Michigan Medical Center (hereafter the medical center), which is operated by defendant.

Following the surgery, plaintiff was periodically examined as an outpatient at the pediatric neurosurgery clinic until October 1982. Sometime after October 1982, but no later than 1985, plaintiff's mother transferred her neurological supervision and all medical records from the medical center to a neurosurgeon, Dr. Jakubiak, who was located closer to the plaintiff's family home. Dr. Jakubiak saw plaintiff twice before the events that gave rise to the present action.

On February 27, 1987, plaintiff complained to her mother that she could not see. The episode passed. Plaintiff saw her pediatrician on March 2. The pediatrician scheduled a skull x-ray and a CAT scan on March 9 at a local hospital. Dr. Jakubiak saw plaintiff the same day. He concluded that the

shunt had become disconnected, that the discon-
nection was unrelated to plaintiff's vision distur-
bance, and that no emergency existed. He recom-
mended that plaintiff seek "a second opinion" from
the medical center and that she see an ophthal-
mologist regarding her vision disturbance.

On the same day, plaintiff's father called Dr.
Dauser's office at the medical center and spoke to
a secretary, Geraldine O'Neill. Plaintiff's father
knew that Ms. O'Neill was not a member of the
medical staff. He told her that plaintiff's shunt had
become disconnected and that she was experienc-
ing intermittent vision problems. He then re-
quested an appointment for a second opinion. He
also told Ms. O'Neill that plaintiff had already
seen Dr. Jakubiak, who did not consider the case
an emergency. Ms. O'Neill initially offered plaintiff
an appointment for about one month later, but
Mr. Weaver asked for an earlier date. After a brief
interruption in their conversation, Ms. O'Neill
offered plaintiff an appointment for March 16,
1987. On March 16, Dr. Dauser saw plaintiff,
diagnosed an elevation in intracranial pressure,
and recommended emergency surgery. The surgery
was performed, but plaintiff unfortunately suffered
a permanent and nearly total loss of vision.

Plaintiff brought suit in the circuit court against
her pediatrician, Dr. Jakubiak, and the local hospi-
tal where the x-ray and CAT scan were performed.
She filed a separate action against the medical
center in the Court of Claims. The two actions
were later joined. All defendants in the circuit
court action settled the claims and are no longer
parties to the suit. The court granted the medical
center's motion for summary disposition on the
grounds that no physician-patient relationship ex-
isted between it and plaintiff on March 9, 1987.

A motion for summary disposition under MCR

2.116(C)(10) tests the factual support for a claim. The court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence available to it and grant summary disposition if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *AFL-CIO v Civil Service Comm,* 191 Mich App 535, 546-547; 478 NW2d 722 (1991); *Panich v Iron Wood Products Corp,* 179 Mich App 136, 139; 445 NW2d 795 (1989).

It is hornbook law that no cause of action for negligence exists unless the defendant owes a legal duty to the plaintiff. See, e.g., *Lorencz v Ford Motor Co,* 439 Mich 370, 375; 483 NW2d 844 (1992). The term "malpractice" denotes a breach of the duty owed by one rendering professional services to a person who has contracted for such services. *Hill v Kokosky,* 186 Mich App 300, 303; 463 NW2d 265 (1990); *Malik v William Beaumont Hosp,* 168 Mich App 159, 168; 423 NW2d 920 (1988). A professional physician-patient relationship is a legal prerequisite of a cause of action for medical malpractice. *Hill, supra* at 303. See, generally, anno: *What constitutes physician-patient relationship for malpractice purposes,* 17 ALR4th 132.

Plaintiff contends that a telephone call to schedule an appointment with a provider of medical services gives rise to a physician-patient relationship that can serve as the basis for a claim of medical malpractice. The question is one of first impression in Michigan. We hold that a telephone call merely to schedule an appointment with a provider of medical services does not by itself establish a physician-patient relationship where the caller has no ongoing physician-patient relationship with the provider and does not seek or obtain medical advice during the conversation.

Cases governed by MCL 600.5805(4); MSA

27A.5805(4) and MCL 600.5838a; MSA 27A.5838(1), relating to limitation of actions for medical malpractice, provide a starting point for analysis. In *Thomas v Golden (Amended Opinion),* 51 Mich App 693; 214 NW2d 907 (1974), aff'd but reasoning not adopted 392 Mich 779; 220 NW2d 677 (1974), the plaintiff had been fitted for contact lenses by the defendant, an optometrist, in February 1968. *Id.* at 694. She experienced problems with the lenses and requested an appointment on March 7. The defendant's office scheduled a March 8 appointment. Plaintiff's condition worsened, so she instead sought treatment at a hospital emergency room on the night of March 7. *Id.* She filed suit on March 5, 1970. At the relevant time, the applicable statute, MCL 600.5838; MSA 27A.5838, provided that "[a] claim based on . . . malpractice . . . accrues at the time that person discontinues treating or otherwise serving the plaintiff." This Court held that the suit was timely because making an appointment constituted "otherwise serving" "within the meaning of the statute." *Id.* at 695. The Court did not decide, however, whether the defendant had been "treating" the plaintiff when he made the appointment for her.

The value of the *Thomas* decision is clouded because the Supreme Court expressly declined to affirm this Court's reasoning. See also *Rice v Zimmer Mfg Co,* 180 Mich App 681, 687; 447 NW2d 771 (1989) ("mere suggestion" that the plaintiff return for further care did not constitute treatment or professional service); *Stapleton v Wyandotte,* 177 Mich App 339, 344; 441 NW2d 90 (1989) (advice to make an appointment for a checkup did not extend the physician-patient relationship).

This Court has also examined the effect of a telephone call on the physician-patient relationship in several other cases involving the statute of

limitations. In *Shane v Mouw,* 116 Mich App 737; 323 NW2d 537 (1982), the defendant had last examined the plaintiff on May 3, 1977, when the plaintiff's son called the defendant on August 7. *Id.* at 741 (MacKenzie, J., dissenting). The defendant offered the plaintiff a prescription, but declined to hospitalize her. She was then treated by another physician. In her suit filed on August 2, 1979, she argued that the phone call constituted "treatment or other services." *Id.* at 742. In a split decision, this Court concluded that the phone call "appear[ed] to have been an attempt by defendant to continue treating plaintiff's condition," and that the suit was timely. *Id.* at 741.

The *Shane* Court relied in part on *DeGrazia v Johnson,* 105 Mich App 356; 306 NW2d 512 (1981). In that case, the plaintiff had knee surgery in February and March of 1976. In June 1976, he spoke by telephone to the defendant doctor about his knee. He filed suit in May of 1978. This Court held that the statutory period of limitation did not begin to run until the June phone call. "[I]t was not until that time that defendant discontinued 'treating or otherwise serving the plaintiff.' " *Id.* at 360.

Recently, however, this Court rejected a single telephone conversation as a basis for extending the accrual date for a medical malpractice claim. In *Griffith v Brant,* 177 Mich App 583, 586-587; 442 NW2d 652 (1989), the plaintiff called her surgeon regarding her postsurgical progress in June 1984 and filed suit in August 1986. The Court concluded that the telephone conversation did not constitute "treatment or otherwise serving" within the meaning of MCL 600.5838(1); MSA 27A.5838(1).

All this Court's "telephone" cases are easily distinguishable from the situation in the present case. In all the other cases, the plaintiffs sought

and received medical advice over the phone. The telephone calls could thus be considered another form of consultation with the professional involved, an extension of an existing physician-patient relationship. Compare *Hill v Kokosky, supra,* where the Court found that a phone call from one physician to another did not create a physician-patient relationship between the first doctor's patient and the second doctor. 186 Mich App 304.

Plaintiff's father admitted that he did not seek or expect medical advice when he called the medical center on March 9. He simply asked Ms. O'Neill for an appointment for a second opinion. He specifically told her that a doctor had stated that no emergency existed. He also testified that he knew defendants maintained an emergency room. Plaintiff's mother and father had, in fact, taken plaintiff there in the past. Where a plaintiff has not sought or received medical advice or treatment from a physician, the physician does not owe such a duty of care as will subject him to liability for malpractice. *Rogers v Horvath,* 65 Mich App 644, 647; 237 NW2d 595 (1975) (no cause of action where the defendant only examined the plaintiff for her employer in connection with a workers' compensation hearing).

The plaintiff and her parents had terminated their relationship with defendant several years before their 1987 telephone call and had arranged to have plaintiff's medical records transferred. When a patient decides to obtain care from a different physician, the physician-patient relationship terminates. See *Antal v Porretta,* 165 Mich App 238, 241; 418 NW2d 395 (1987) (relationship ceased when the plaintiff decided he did not want the defendant to treat him any longer and went to an emergency room instead); *Bosel v Babcock,* 153 Mich App 592, 596; 396 NW2d 448 (1986) (physi-

cian-patient relationship terminated when the plaintiff was transferred to a different hospital for treatment by a different doctor). See also *Heisler v Rogers*, 113 Mich App 630, 633; 318 NW2d 503 (1982) (cessation of physician-patient relationship marks the point when statutory period of limitation begins to run).

To prevail on her claim, plaintiff had to establish either an ongoing relationship with the medical center, of which the March 9 phone call was a part, or a revival of the previous physician-patient relationship because of the March 9 phone call. Because the prior relationship had ended, the phone call could not have been part of an ongoing physician-patient relationship. Plaintiff's father did not seek or receive medical advice or treatment during his call. Under existing Michigan cases, the telephone call did not establish a new relationship.

The setting of an appointment, by itself, did not initiate or revive a relationship between plaintiff and the medical center. Plaintiff would not, for example, have been expected to pay for merely having an appointment made. Alternatively, if the medical center later canceled the appointment, plaintiff would not have a malpractice claim.[1] Plaintiff asks us to broaden the duty of doctors to include potential patients, i.e., those who only have appointments for examination or treatment. We decline to take this step.

Other states also have hesitated to find that a second-hand telephone contact alone is sufficient to establish a physician-patient relationship. See *Mozingo v Pitt Co Memorial Hosp*, 101 NC App

---

[1] With the exception of certain emergency settings not relevant here, a physician is not required to render services to anyone. See, generally, 17 ALR4th 132, 137-140; *Childs v Weis*, 440 SW2d 104, 107 (Tex Civ App, 1969).

578; 400 SE2d 747 (1991), aff'd 331 NC 182; 415 SE2d 341 (1992) (no physician-patient relationship between "on-call" obstetrician and maternity patient); *Fought v Solce*, 821 SW2d 218, 219 (Tex Civ App, 1991) (no relationship between on-call specialist and emergency room patient where the defendant declined to come in and examine the plaintiff); *Fabian v Matzko*, 236 Pa Super 267; 344 A2d 569 (1975) (no relationship where the plaintiff's husband spoke to the doctor on the phone, trying to have the plaintiff admitted to the hospital); *Childs v Weis*, 440 SW2d 104, 107 (Tex Civ App, 1969) (no relationship where a doctor, contacted about an emergency room patient, told an emergency room nurse to have the patient contact her own doctor in another city).

In *Rizk v Cohen*, 73 NY2d 98; 538 NYS2d 229; 535 NE2d 282 (1989), the plaintiff had been a patient of the defendant, an otolaryngologist. The plaintiff consulted the defendant for an ear problem in 1980. An examination neither established nor ruled out whether the plaintiff had a tumor of the auditory nerve. The plaintiff was advised to return to the hospital in six months. More than three years later, the defendant came across the plaintiff's medical records and called him "to see what he had done about his ear condition." *Id.* at 101. When the defendant found out that the plaintiff had done nothing, the defendant suggested that the plaintiff come in for an examination. The 1983 tests revealed the existence of a tumor. The surgery to remove it caused permanent injury. *Id.* at 101-102.

The plaintiff sued approximately seven months after the 1983 phone call. Dismissal of the suit as untimely was upheld. The phone call did not bring the case within a "continuous treatment" excep-

tion to New York's statute of limitations for medical malpractice:

> That a degree of continuity exists by virtue of Dr. Cohen's unilateral initiative in October 1983 is unhelpful to plaintiff's position because that contact does not establish the continuing trust *on the plaintiff's part* that the continuous treatment doctrine requires. [*Id.* at 104; emphasis in original.]

*Doyle v Planned Parenthood of Seattle-King Co, Inc,* 31 Wash App 126; 639 P2d 240 (1982), is similar. The plaintiff had an intauterine device inserted in 1970, but did not return to the clinic after that procedure. In 1975, the defendant attempted but failed to locate her to advise that the device be removed. When the plaintiff attempted to sue after developing problems associated with the IUD, the court rejected the claim as untimely.

> [The plaintiff] *last contacted Planned Parenthood in 1970;* she consulted other doctors about her pelvic-area pains in April 1975. The physician-patient relationship had ended by that time and was not revived by the attempts to telephone [the plaintiff]. [*Id.* at 130; emphasis in original.]

See also *Giles v Sanford Memorial Hosp & Nursing Home,* 371 NW2d 635, 637 (Minn App, 1985), where the court held that a telephone call that did not discuss medication or treatment and in which the plaintiff received no advice was not part of a continuing physician-patient relationship; and *Lyons v Grether,* 218 Va 630; 239 SE2d 103 (1977), which held that the plaintiff's allegation that she had an appointment with the defendant would have been insufficient by itself to create a physician-patient relationship, but that an appointment to treat a specific condition alleged a consensual transaction giving rise to such a relationship.

We decline to recognize a physician-patient relationship from the single telephone call from the plaintiff's father to Dr. Dauser's office.

Affirmed.