Shirley JACKSON, Individually and as Representative of the Estate of Marvin Glenn Jackson, Deceased; Katina Griggs; Sandra O'Neal; and Scott Jackson, Appellants,

v.

Michael ISAAC, M.D. and Hillcrest Health Care Services, Inc., Appellees.

No. 11–01–00269–CV.

Court of Appeals of Texas, Eastland.

April 18, 2002.

Michael Penick, Robert Greening, Penick & Greening, Attorneys at Law, Dallas, for appellant.

John Kyle, Kim Lucas, Kyle & Mathis, Attorneys at Law, Dallas, for appellee.

Panel consists of ARNOT, C.J., and McCALL, J., and Austin McCLOUD, S.J.(Retired)[1]

## Opinion

TERRY McCALL, Justice.

The question in this medical malpractice case is whether a physician-patient relationship was established. Dr. Michael Isaac, a cardiologist, agreed on a Thursday to see Dr. John Psutka's patient, Marvin Glenn Jackson, the following Monday. Based on Dr. Psutka's telephone call, Dr. Isaac's office scheduled Jackson for an echocardiogram at 11:15 a.m. on Monday to be followed by an office visit with Dr. Isaac at 12:30 p.m. Before ever seeing Dr. Isaac, Jackson died from acute cardiac arrest on Sunday evening. The trial court granted summary judgment for Dr. Isaac and his employer, Hillcrest Health Care Services, Inc. We affirm.

*Background Facts*

On Tuesday, June 22, 1999, Jackson went to see Dr. Psutka, his family doctor. After listening to Jackson's complaints, Dr. Psutka had Jackson take an electrocardiogram (EKG). Because the results of the EKG were abnormal, Dr. Psutka determined that Jackson should be referred to a cardiologist. Dr. Psutka called Dr. Isaac on June 24, 1999; the Jacksons were not with Dr. Psutka at the time. During the telephone call, Dr. Psutka told Dr. Isaac that Jackson had evidence of congestive heart failure and evidence of ischemia on his EKG. He also advised Dr. Isaac that Jackson needed to be seen "fairly soon like today." Dr. Psutka told Dr. Isaac that he would fax Jackson's medical records to Dr. Isaac, and Dr. Psutka personally faxed the medical records that day. Dr. Psutka stated that he was under the impression that Dr. Isaac was going to review Jackson's medical records that day.

Dr. Isaac said that he told Dr. Psutka that he would see Jackson that day, June 24, if Dr. Psutka thought it was necessary and that Dr. Psutka said that it would not be necessary. Dr. Psutka gave Jackson's telephone number to Dr. Isaac. Dr. Isaac wrote a note to himself that Jackson "probably need[ed] an echo and an office visit." Later that day, someone from Dr. Isaac's office called Jackson to tell him about the appointment on Monday, June 28.

Jackson met with Dr. Psutka on Friday, June 25, for a previously scheduled office visit. Dr. Psutka stated that, at first, he was concerned that Jackson would not see Dr. Isaac until the following Monday. However, after Dr. Psutka evaluated Jackson on June 25, he found Jackson "to be significantly improved." Based on that

---

1. Austin McCloud, Retired Chief Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.

evaluation, Dr. Psutka said that he did not call Dr. Isaac and ask Dr. Isaac to see Jackson before Monday. Jackson died on Sunday.

Appellants settled their wrongful death claims against Dr. Psutka. Dr. Isaac and Hillcrest filed a traditional and a no-evidence motion for summary judgment. TEX.R.CIV.P. 166a(c) and 166a(i). They moved for summary judgment on two grounds: (1) no physician-patient relationship existed between Jackson and Dr. Isaac and (2) Dr. Isaac was not negligent. In granting summary judgment for Dr. Isaac and Hillcrest, the trial court did not state which ground that it relied on. Because the order of the trial court did not specify the grounds for its summary judgment, the summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. See *State Farm Fire & Casualty Company v. S.S. & G.W.*, 858 S.W.2d 374, 380 (Tex.1993); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). We will only address the physician-patient relationship.

*Standard of Review*

■ A trial court must grant a motion for summary judgment if the moving party establishes that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. Rule 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). A trial court properly grants summary judgment for a defendant if he establishes all the elements of an affirmative defense. *American Tobacco Company, Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). Once the movant establishes his right to a summary judgment, the non-movant must come forward with evidence or law that precludes summary judgment. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678–79 (Tex.1979). When reviewing a

summary judgment, the appellate court takes as true evidence favorable to the non-movant. *American Tobacco Company, Inc. v. Grinnell*, supra at 425; *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546, 548–49 (Tex.1985).

■ The appellate court reviews evidence presented in response to a motion for a no-evidence summary judgment (Rule 166a(i)) in the same way it reviews evidence presented in response to a traditional motion for summary judgment (Rule 166a(c)), accepting as true evidence favorable to the non-movant, indulging every reasonable inference, and resolving all doubts in favor of the non-movant. *Hight v. Dublin Veterinary Clinic*, 22 S.W.3d 614, 619 (Tex.App.-Eastland 2000, pet'n den'd).

*No Physician–Patient Relationship Established*

■ In a medical malpractice action, the plaintiff must prove that the physician owed a duty to the patient to act according to an applicable standard of care. That duty to act normally arises because of a physician-patient relationship and does not exist absent that relationship. *St. John v. Pope*, 901 S.W.2d 420 (Tex.1995); *Bird v. W.C.W.*, 868 S.W.2d 767 (Tex.1994).

The leading Texas Supreme Court case on establishing a physician-patient relationship is *St. John*. In that case, an emergency room physician telephoned the hospital's on-call physician, Dr. St. John, a board-certified internist. After the emergency room doctor described the patient's symptoms, Dr. St. John concluded that the hospital was not equipped to treat the patient and recommended that the patient be referred to another hospital. The *St. John* court stated that it agreed with those cases that hold that the duty to treat the patient with proper professional skill flows from the consensual relationship between

the patient and the physician. Id. at 423. The supreme court held that, as a matter of law, there was no physician-patient relationship between Dr. St. John and the patient because Dr. St. John never agreed to treat the patient. In the words of the supreme court:

Although St. John listened to Suarez's description of Pope's symptoms, and came to a conclusion about the basis of Pope's condition, he did so for the purpose of evaluating whether he should take the case, *not as a diagnosis for a course of treatment.* (Emphasis added)

*St. John v. Pope,* supra at 424.

In the present case, Dr. Isaac agreed to see Jackson as a patient and evaluate him. The question before this court is whether an agreement by a physician to see a new patient is sufficient to establish the physician-patient relationship for purposes of imposing a duty to act on the physician or whether the physician must take some affirmative action with regard to treatment of a new patient before the relationship is established. If the latter, then was the scheduling of an echocardiogram to allow Dr. Isaac to evaluate and diagnose Jackson an affirmative act sufficient to impose a duty to act on Dr. Isaac on that Thursday?

Neither Dr. Isaac nor Hillcrest was under any contractual duty to treat Jackson. No health care plan imposing a duty was involved. See *Hand v. Tavera,* 864 S.W.2d 678 (Tex.App.-San Antonio 1993, no writ). Texas cases have held that, where no prior relationship existed, the doctor must take some affirmative step to treat the patient before a relationship can be established. *Reynosa v. Huff,* 21 S.W.3d 510 (Tex.App.-San Antonio 2000, no pet'n); *Ortiz v. Shah,* 905 S.W.2d 609, 611 (Tex.App.-Houston [14th Dist.] 1995, writ den'd); *Lopez v. Aziz,* 852 S.W.2d 303, 306 (Tex.App.-San Antonio 1993, no writ); *Wheeler v. Yettie Kersting Memorial Hospital,* 866 S.W.2d 32, 37–40 (Tex.App.-Houston [1st Dist] 1993, no writ).

In *Reynosa v. Huff,* Dr. Huff was present in the operating room supervising the residents who were performing cesarean deliveries. Maria Reynosa was a patient in that room. The Reynosas asserted that Dr. Huff negligently failed to supervise Maria's doctor and that his negligence was the proximate cause of their son's injuries. They further argued that the hospital's bylaws charged every physician on its medical staff to ensure that patients at the facility received quality care. The court observed that the unrebutted evidence of Dr. Huff was that the procedure at the hospital was for back-up on-call physicians to be assigned to specific patients and that Dr. Huff was specifically assigned to patients other than Maria that night. Because Dr. Huff took no affirmative step to treat Maria, the court found that a physician-patient relationship was not established.

The case of *Ortiz v. Shah* involved an on-call physician who, at the emergency room nurse's request, agreed to come to the hospital to treat the patient. The hospital bylaws and policies stated that an on-call physician must be within 20 minutes of the hospital. Before Dr. Shah could get to the hospital, the patient died. Citing *Lopez v. Aziz,* the court affirmed the summary judgment for Dr. Shah and stated:

When a doctor has no prior relationship with a patient, the doctor-patient relationship is not established until the doctor takes some affirmative action toward treatment of the patient.

The *Ortiz* court specifically noted that Dr. Shah never saw the patient, never talked to him, and never gave any advice to anyone in the emergency room about the patient.

In *Lopez v. Aziz*, the plaintiffs brought suit against Dr. Aziz, alleging that he consulted with Mrs. Lopez's treating physician on her behalf and with her implied consent and that Dr. Aziz failed to recommend correct treatment. Her treating physician testified that, although he was Mrs. Lopez's primary physician and ultimately responsible for her medical care, he sought by telephone and then followed Dr. Aziz's medical advice. That advice included laboratory analyses (blood analysis, urinalysis, and coagulation studies) which would take approximately 24 hours to complete. Mrs. Lopez began to suffer seizures, and an emergency cesarean section was performed. Although a viable baby was delivered, Mrs. Lopez died. Affirming the trial court's summary judgment for Dr. Aziz, the appellate court found that Dr. Aziz did no more than answer the professional inquiry of a colleague and that there was no evidence of any consensual basis for the existence of a physician-patient relationship.

In *Wheeler v. Yettie Kersting Memorial Hospital*, the emergency room nurse called Dr. Rodriguez for advice. The nurse told Dr. Rodriguez that Mrs. Wheeler wanted to be transferred to John Sealy Hospital where her prenatal records were and that the nurse wanted to make certain that Mrs. Wheeler could be safely transferred. Although he did not think that he was on call that day, Dr. Rodriguez told the nurse that he would help resolve her problem. The nurse related to Dr. Rodriguez that the doctor at John Sealy Hospital, after being told of Mrs. Wheeler's symptoms, had approved the transfer of Mrs. Wheeler to John Sealy Hospital. The nurse described Mrs. Wheeler's symptoms to Dr. Rodriguez. The *Wheeler* court found that, by evaluating the status of Mrs. Wheeler's labor and by giving his approval to transport her to John Sealy Hospital, Dr. Rodriguez had rendered services to Mrs. Wheeler, thereby establishing a physician-patient relationship with Mrs. Wheeler.

It is undisputed that Dr. Isaac did not convey any advice to Dr. Psutka during their one telephone call. It is also undisputed that Dr. Isaac never saw Jackson and that Dr. Isaac did not render any medical advice for the treatment of Jackson. Although Dr. Psutka testified that he told Dr. Isaac that Dr. Isaac needed to see Jackson soon, Dr. Psutka also testified that he did not consider the situation to be an emergency. We must determine whether Dr. Isaac's step in scheduling an appointment for Jackson and in scheduling an echocardiogram were affirmative steps that established a duty on the part of Dr. Isaac.

Dr. Isaac stated that, based on the information given to him by Dr. Psutka, the only way to diagnose and treat Jackson was to see Jackson in person and evaluate him. Because he needed more information to properly diagnose Jackson, Dr. Isaac had his office schedule Jackson for an echocardiogram before he evaluated Jackson in person.

There are no Texas cases directly on point. Dr. Isaac points out that courts in New York and Michigan have held that a telephone call to schedule an appointment with a physician does not establish a physician-patient relationship where there is not already an ongoing physician-patient relationship with the provider. See *Miller v. Sullivan*, 214 A.D.2d 822, 625 N.Y.S.2d 102 (1995); *Weaver v. Board of Regents of the University of Michigan*, 201 Mich.App. 239, 506 N.W.2d 264 (1993). The decedent in *Miller* telephoned his friend, a doctor, stating that he thought he was having a heart attack because he was sweaty, had back pain, and was having trouble breathing. The doctor told him to come to his

office immediately. The call was made between 9:30 and 10:00 a.m. The decedent, a dentist, continued to see his patients and did not go to see the doctor until early afternoon. The decedent went into cardiac arrest within minutes after he arrived at the doctor's office. Although acknowledging that a physician-patient relationship can arise from a phone call, the court in *Miller* observed that the relationship was created only when professional services are rendered and accepted. The court found that the doctor had rendered no medical services. The New York court further stated:

> A telephone call affirmatively advising a prospective patient as to a course of treatment can constitute professional service for the purpose of creating a physician-patient relationship only when the advice, if incorrect, would be actionable. (See, *Bienz v. Central Suffolk Hosp.*, 163 A.D.2d 269, 557 N.Y.S.2d 139 (1990)).

A recent case, *Irvin v. Smith*, 31 P.3d 934 (Kan.2001), is informative. Dr. Smith, Ashley Irvin's treating physician, contacted Dr. Gilmartin and asked Dr. Gilmartin to perform a consultation on Irvin. The two doctors discussed the case, and Dr. Gilmartin agreed to see the patient the next morning, carry out a formal consultation, and assume responsibility for conducting the diagnostic test known as a shuntogram. A shuntogram is a procedure which involves the injection of a radioactive isotope into the shunt to check for shunt blockage. Irvin was born with hydrocephalus, and a properly operating shunt was critical to her survival. Prior to any tests being performed to determine the status of the shunt, Irvin's condition deteriorated during the next morning, became critical, and required that she be resuscitated and intubated. When the shuntogram was finally performed, it was determined that the shunt was obstructed.

That obstruction caused Irvin's injuries. Surgery was performed to correct the shunt malfunction. Irvin suffered permanent and severe brain damage prior to undergoing the shuntogram procedure.

The Kansas court in *Irvin* began its analysis by noting that a physician's indirect contact with a patient does not preclude the finding of a physician-patient relationship. The *Irvin* court stated that Kansas law requires that the doctor must take some affirmative action with regard to treatment of a patient in order for the physician-patient relationship to be established. *Irvin v. Smith*, supra at 941. After an exhaustive review of cases around the country, including *St. John v. Pope*, the Kansas court held that the mere act of Dr. Gilmartin agreeing to see the patient at a later time did not establish the physician-patient relationship. The court reasoned that:

> This case, to a large extent, boils down to public policy concerns. The type of telephone conversation that took place here takes place on a frequent basis in the medical profession and is vital to the treatment of patients. For the courts to discourage such conversations is not to the patients' or the public's best interests.

If Dr. Isaac had made an appointment for Jackson but Jackson had not shown up and then died a week or a month later, no physician-patient relationship would have been established. That is what occurred in the New York case of *Miller v. Sullivan*. The doctor told the decedent to come to his office right away, but the decedent decided to wait until the afternoon to see the doctor. He died while waiting to see the doctor. Here, Jackson died before going to Dr. Isaac's office for the appointment. Dr. Isaac did not see Jackson, did not diagnose Jackson, and did

not give any medical advice concerning treatment.

The doctor in *Ortiz* consented to the physician-patient relationship; however, the patient died before the doctor could get to the hospital to diagnose and treat him. The *Ortiz* court held that no physician-patient relationship was established because the doctor had taken no "affirmative action toward treatment of the patient." *Ortiz v. Shah,* supra at 611.

Appellants cite *Lection v. Dyll,* 65 S.W.3d 696 (Tex.App.-Dallas 2001, pet'n filed), where the Dallas court found that Dr. Dyll, a neurologist, assumed a duty to the patient because he took some affirmative action to treat the patient. The court pointed out that Dr. Dyll was the on-call physician and that he made a diagnosis of the patient. After listening to the emergency room doctor, Dr. Syed, explain Lection's symptoms, Dr. Dyll told Dr. Syed that Lection had a hemiplegic migraine, that "no further treatment needed to be done for this patient at the time," and that it was alright for the patient to go home. Dr. Dyll told Dr. Syed to "just have her come back to [Dyll's] office on Monday." Before the Monday appointment with Dr. Dyll, the patient suffered a disabling stroke.

We are aware of the following language in *St. John v. Pope,* supra at 424:

> It is only with a physician's consent, whether express or implied, that the doctor-patient relationship comes into being. Thus we agree with those cases that hold that the duty to treat the patient with proper professional skill flows from the consensual relationship between the patient and physician.

The *St. John* court had before it a case where the doctor evaluated the patient and then concluded that he should not treat the patient. The supreme court noted:

> St. John's affidavit testimony that he never *agreed to treat* Pope is clear, positive, direct, and easily controvertible. If any agreement existed which divested St. John of the discretion to choose whether *to treat a patient,* it was incumbent on Pope to present it in order to preclude summary judgment for the doctor. (Emphasis added)

*St. John v. Pope,* supra at 424.

■ Here, Dr. Isaac agreed to see Jackson and then evaluate him but never had an opportunity to do so. Although the supreme court discussed the physician-patient relationship in consensual terms, a physician's agreement to see a new patient should not by itself establish the physician-patient relationship. After evaluating Jackson, Dr. Isaac might have concluded that he was not the appropriate physician to treat Jackson, just as the doctor did in *St. John.* To hold that there was a physician-patient relationship imposing a duty on Dr. Isaac prior to the Monday appointment would significantly extend the duty of a physician where the physician has had no previous contact with a patient. This we decline to do.

The scheduling of an echocardiogram was the scheduling of a procedure to allow Dr. Isaac to evaluate and diagnose Jackson. Scheduling the appointment and the diagnostic procedure did not rise to an affirmative act of treatment that established the physician-patient relationship for creating a duty. Dr. Isaac simply agreed to see Jackson if Jackson came to his office on Monday. If a person calls a new doctor to schedule a physical exam and the doctor's office schedules that potential patient for an EKG and blood tests, there has been no affirmative act to treat the patient by the mere fact that the doctor's office has scheduled the appointment and the tests.

Doctors frequently refer their patients to medical specialists who have a certain medical expertise. We hold that the mere scheduling of a diagnostic procedure and an appointment by a medical specialist or his staff does not create a physician-patient relationship. The trial court did not err if it based its summary judgment on a finding that there was no physician-patient relationship between Dr. Isaac and Jackson that created a duty to act on the part of Dr. Isaac.

*This Court's Ruling*

We affirm the summary judgment of the trial court.