11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Shirley Jackson, Individually and as

Representative of the Estate of Marvin

Glenn Jackson, Deceased; Katina Griggs;

Sandra O=Neal; and Scott Jackson

 

Appellants

Vs.                   No.
11-01-00269-CV B Appeal from Grayson County

Michael Isaac, M.D. and Hillcrest

Health Care Services,
Inc.

Appellees

 

The
question in this medical malpractice case is whether a physician-patient
relationship was established.  Dr.
Michael Isaac, a cardiologist, agreed on a Thursday to see Dr. John Psutka=s patient, Marvin Glenn Jackson, the
following Monday.  Based on Dr. Psutka=s telephone call, Dr. Isaac=s office scheduled Jackson for an
echocardiogram at 11:15 a.m. on Monday to be followed by an office visit with
Dr. Isaac at 12:30 p.m.  Before ever
seeing Dr. Isaac, Jackson died from acute cardiac arrest on Sunday
evening.  The trial court granted
summary judgment for Dr. Isaac and his employer, Hillcrest Health Care
Services, Inc.  We affirm.

Background
Facts








On
Tuesday, June 22, 1999, Jackson went to see Dr. Psutka, his family doctor.  After listening to Jackson=s complaints, Dr. Psutka had Jackson take an
electrocardiogram (EKG).  Because the
results of the EKG were abnormal, Dr. Psutka determined that Jackson should be
referred to a cardiologist.  Dr. Psutka
called Dr. Isaac on June 24, 1999; the Jacksons were not with Dr. Psutka at the
time.  During the telephone call, Dr.
Psutka told Dr. Isaac that Jackson had evidence of congestive heart failure and
evidence of ischemia on his EKG.  He
also advised Dr. Isaac that Jackson needed to be seen Afairly soon like today.@  Dr.
Psutka told Dr. Isaac that he would fax Jackson=s medical records to Dr. Isaac, and Dr. Psutka personally faxed the
medical records that day.  Dr. Psutka
stated that he was under the impression that Dr. Isaac was going to review
Jackson=s medical records that day. 

Dr. Isaac
said that he told Dr. Psutka that he would see Jackson that day, June 24, if
Dr. Psutka thought it was necessary and that Dr. Psutka said that it would not
be necessary.  Dr. Psutka gave Jackson=s telephone number to Dr. Isaac.  Dr. Isaac wrote a note to himself that
Jackson Aprobably need[ed] an echo and an office
visit.@ 
Later that day, someone from Dr. Isaac=s office called Jackson to tell him about the appointment on Monday,
June 28.  

Jackson
met with Dr. Psutka on Friday, June 25, for a previously scheduled office
visit.  Dr. Psutka stated that, at
first, he was concerned that Jackson would not see Dr. Isaac until the
following Monday.  However, after Dr.
Psutka evaluated Jackson on June 25, he found Jackson Ato be significantly improved.@ 
Based on that evaluation, Dr. Psutka said that he did not call Dr. Isaac
and ask Dr. Isaac to see Jackson before Monday.  Jackson died on Sunday.

Appellants settled their wrongful death claims against Dr. Psutka.  Dr. Isaac and Hillcrest filed a traditional
and a no-evidence motion for summary judgment. TEX.R.CIV.P. 166a(c) and
166a(i).  They moved for summary
judgment on two grounds:  (1) no
physician-patient relationship existed between Jackson and Dr. Isaac and (2)
Dr. Isaac was not negligent.  In
granting summary judgment for Dr. Isaac and Hillcrest, the trial court did not
state which ground that it relied on. 
Because the order of the trial court did not specify the grounds for its
summary judgment, the summary judgment will be affirmed on appeal if any of the
theories advanced are meritorious.  See
State Farm Fire & Casualty Company v. S.S. & G.W., 858 S.W.2d 374, 380
(Tex.1993); Carr v. Brasher, 776 S.W.2d 567, 569 (Tex.1989).  We will only address the physician-patient
relationship.                                                                 Standard
of Review








A trial
court must grant a motion for summary judgment if the moving party establishes
that no genuine issue of material fact exists and that he is entitled to
judgment as a matter of law.  Rule
166a(c); Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex.1991).  A trial court properly grants summary
judgment for a defendant if he establishes all the elements of an affirmative
defense.  American Tobacco Company, Inc.
v. Grinnell, 951 S.W.2d 420, 425 (Tex.1997). 
Once the movant establishes his right to a summary judgment, the
non-movant must come forward with evidence or law that precludes summary
judgment.  City of Houston v. Clear
Creek Basin Authority, 589 S.W.2d 671, 678-79 (Tex.1979).  When reviewing a summary judgment, the
appellate court takes as true evidence favorable to the non-movant.  American Tobacco Company, Inc. v. Grinnell,
supra at 425; Nixon v. Mr. Property Management Company, Inc., 690 S.W.2d 546,
548-49 (Tex.1985).  

The
appellate court reviews evidence presented in response to a motion for a
no-evidence summary judgment (Rule 166a(i)) in the same way it reviews evidence
presented in response to a traditional motion for summary judgment (Rule
166a(c)), accepting as true evidence favorable to the non-movant, indulging
every reasonable inference, and resolving all doubts in favor of the
non-movant.  Hight v. Dublin Veterinary
Clinic, 22 S.W.3d 614, 619 (Tex.App. B Eastland 2000, pet=n den=d).

                                            No
Physician-Patient Relationship Established

In a
medical malpractice action, the plaintiff must prove that the physician owed a
duty to the patient to act according to an applicable standard of care.  That duty to act normally arises because of
a physician-patient relationship and does not exist absent that relationship.  St. John v. Pope, 901 S.W.2d 420 (Tex.1995);
Bird v. W.C.W., 868 S.W.2d 767 (Tex.1994). 


The
leading Texas Supreme Court case on establishing a physician-patient
relationship is St. John.  In
that case, an emergency room physician telephoned the hospital=s on-call physician, Dr. St. John, a
board-certified internist.  After the
emergency room doctor described the patient=s symptoms, Dr. St. John concluded that the hospital was not equipped
to treat the patient and recommended that the patient be referred to another
hospital.  The St. John court
stated that it agreed with those cases that hold that the duty to treat the
patient with proper professional skill flows from the consensual relationship
between the patient and the physician. 
Id. at 423.  The supreme court
held that, as a matter of law, there was no physician-patient relationship
between Dr. St. John and the patient because Dr. St. John never agreed to treat
the patient.  In the words of the
supreme court:

Although St. John listened to Suarez=s description of Pope=s symptoms, and came to a conclusion about
the basis of Pope=s
condition, he did so for the purpose of evaluating whether he should take the
case, not as a diagnosis for a course of treatment.  (Emphasis added) 

 

St. John v. Pope, supra at 424.








In the
present case, Dr. Isaac agreed to see Jackson as a patient and evaluate
him.  The question before this court is
whether an agreement by a physician to see a new patient is sufficient to
establish the physician-patient relationship for purposes of imposing a duty to
act on the physician or whether the physician must take some affirmative action
with regard to treatment of a new patient before the relationship is
established.  If the latter, then was
the scheduling of an echocardiogram to allow Dr. Isaac to evaluate and diagnose
Jackson an affirmative act sufficient to impose a duty to act on Dr. Isaac on
that Thursday?

Neither
Dr. Isaac nor Hillcrest was under any contractual duty to treat Jackson.  No health care plan imposing a duty was
involved. See Hand v. Tavera, 864 S.W.2d 678 (Tex.App. - San Antonio 1993, no
writ).  Texas cases have held that,
where no prior relationship existed, the doctor must take some affirmative step
to treat the patient before a relationship can be established.  Reynosa v. Huff, 21 S.W.3d 510 (Tex.App. B San Antonio 2000, no pet=n); Ortiz v. Shah, 905 S.W.2d 609, 611
(Tex.App. B Houston [14th Dist.] 1995, writ den=d); Lopez v. Aziz, 852 S.W.2d 303, 306
(Tex.App. B San Antonio 1993, no writ); Wheeler v.
Yettie Kersting Memorial Hospital, 866 S.W.2d 32, 37-40 (Tex.App. B Houston [1st Dist] 1993, no writ).

In Reynosa
v. Huff, Dr. Huff was present in the operating room supervising the
residents who were performing cesarean deliveries.  Maria Reynosa was a patient in that room.  The Reynosas asserted that Dr. Huff
negligently failed to supervise Maria=s doctor and that his negligence was the proximate cause of their son=s injuries. 
They further argued that the hospital=s bylaws charged every physician on its medical staff to ensure that
patients at the facility received quality care.  The court observed that the unrebutted evidence of Dr. Huff was
that the procedure at the hospital was for back-up on-call physicians to be
assigned to specific patients and that Dr. Huff was specifically assigned to
patients other than Maria that night. 
Because Dr. Huff took no affirmative step to treat Maria, the court
found that a physician-patient relationship was not established.








The case
of Ortiz v. Shah  involved an
on-call physician who, at the emergency room nurse=s request, agreed to come to the hospital to
treat the patient.  The hospital bylaws
and policies stated that an on-call physician must be within 20 minutes of the
hospital.  Before Dr. Shah could get to
the hospital, the patient died.  Citing Lopez
v. Aziz, the court affirmed the summary judgment for Dr. Shah and stated:

When a doctor has no prior relationship with
a patient, the doctor-patient relationship is not established until the doctor
takes some affirmative action toward treatment of the patient. 

 

The Ortiz court
specifically noted that Dr. Shah never saw the patient, never talked to him,
and never gave any advice to anyone in the emergency room about the patient.

In Lopez
v. Aziz, the plaintiffs brought suit against Dr. Aziz, alleging that he
consulted with Mrs. Lopez=s treating physician on her behalf and with her implied consent and
that Dr. Aziz failed to recommend correct treatment.  Her treating physician testified that, although he was Mrs. Lopez=s primary physician and ultimately
responsible for her medical care, he sought by telephone and then followed Dr.
Aziz=s medical advice.  That advice included laboratory analyses (blood analysis,
urinalysis, and coagulation studies) which would take approximately 24 hours to
complete.  Mrs. Lopez began to suffer
seizures, and an emergency cesarean section was performed.  Although a viable baby was delivered, Mrs.
Lopez died.  Affirming the trial court=s summary judgment for Dr. Aziz, the
appellate court found that Dr. Aziz did no more than answer the professional
inquiry of a colleague and that there was no evidence of any consensual basis
for the existence of a physician-patient relationship.  

In Wheeler
v. Yettie Kersting Memorial Hospital, the emergency room nurse called Dr.
Rodriguez for advice.  The nurse told
Dr. Rodriguez that Mrs. Wheeler wanted to be transferred to John Sealy Hospital
where her prenatal records were and that the nurse wanted to make certain that
Mrs. Wheeler could be safely transferred. 
Although he did not think that he was on call that day, Dr. Rodriguez
told the nurse that he would help resolve her problem.  The nurse related to Dr. Rodriguez that the
doctor at John Sealy Hospital, after being told of Mrs. Wheeler=s symptoms, had approved the transfer of Mrs.
Wheeler to John Sealy Hospital.  The
nurse described Mrs. Wheeler=s symptoms to Dr. Rodriguez. 
The Wheeler court found that, by evaluating the status of Mrs.
Wheeler=s labor and by giving his approval to
transport her to John Sealy Hospital, Dr. Rodriguez had rendered services to
Mrs. Wheeler, thereby establishing a physician-patient relationship with Mrs.
Wheeler.








It is
undisputed that Dr. Isaac did not convey any advice to Dr. Psutka during their
one telephone call.  It is also
undisputed that Dr. Isaac never saw Jackson and that Dr. Isaac did not render
any medical advice for the treatment of Jackson.  Although Dr. Psutka testified that he told Dr. Isaac that Dr.
Isaac needed to see Jackson soon, Dr. Psutka also testified that he did not
consider the situation to be an emergency. 
We must determine whether Dr. Isaac=s step in scheduling an appointment for Jackson and in scheduling an
echocardiogram were affirmative steps that established a duty on the part of
Dr. Isaac.

Dr. Isaac
stated that, based on the information given to him by Dr. Psutka, the only way
to diagnose and treat Jackson was to see Jackson in person and evaluate
him.  Because he needed more information
to properly diagnose Jackson, Dr. Isaac had his office schedule Jackson for an
echocardiogram before he evaluated Jackson in person. 

There are
no Texas cases directly on point.  Dr.
Isaac points out that courts in New York and Michigan have held that a
telephone call to schedule an appointment with a physician does not establish a
physician-patient relationship where there is not already an ongoing
physician-patient relationship with the provider.  See Miller v. Sullivan, 625 N.Y.S.2d 102 (N.Y. App. Div. 1995);
Weaver v. Board of Regents of the University of Michigan, 506 N.W.2d 264 (Mich.
Ct. App. 1993).  The decedent in Miller
telephoned his friend, a doctor, stating that he thought he was having a heart
attack because he was sweaty, had back pain, and was having trouble
breathing.  The doctor told him to come
to his office immediately.  The call was
made between 9:30 and 10:00 a.m. The decedent, a dentist, continued to see his
patients and did not go to see the doctor until early afternoon.  The decedent went into cardiac arrest within
minutes after he arrived at the doctor=s office.  Although
acknowledging that a physician-patient relationship can arise from a phone
call, the court in Miller 
observed that the relationship was created only when professional
services are rendered and accepted.  The
court found that the doctor had rendered no medical services.  The New York court further stated:

A telephone call affirmatively advising a
prospective patient as to a course of treatment can constitute professional
service for the purpose of creating a physician-patient relationship only when
the advice, if incorrect, would be actionable. (See, Bienz v. Central Suffolk
Hosp., [557 N.Y.S.2d 139 (N.Y. App. Div. 1990)].

 








A recent
case, Irvin v. Smith, 31 P.3d 934 (Kan.2001), is informative.  Dr. Smith, Ashley Irvin=s treating physician, contacted Dr. Gilmartin
and asked Dr. Gilmartin to perform a consultation on Irvin.  The two doctors discussed the case, and Dr.
Gilmartin agreed to see the patient the next morning, carry out a formal
consultation, and assume responsibility for conducting the diagnostic test
known as a shuntogram.  A shuntogram is
a procedure which involves the injection of a radioactive isotope into the
shunt to check for shunt blockage. 
Irvin was born with hydrocephalus, and a properly operating shunt was
critical to her survival.  Prior to any
tests being performed to determine the status of the shunt, Irvin=s condition deteriorated during the next
morning, became critical, and required that she be resuscitated and
intubated.  When the shuntogram was
finally performed, it was determined that the shunt was obstructed.  That obstruction caused Irvin=s injuries. 
Surgery was performed to correct the shunt malfunction.  Irvin suffered permanent and severe brain
damage prior to undergoing the shuntogram procedure.

The Kansas
court in Irvin began its analysis by noting that a physician=s indirect contact with a patient does not
preclude the finding of a physician-patient relationship.  The Irvin court stated that Kansas
law requires that the doctor must take some affirmative action with regard to
treatment of a patient in order for the physician-patient relationship to be
established.  Irvin v. Smith, supra at
941.  After an exhaustive review of
cases around the country, including St. John v. Pope,  the Kansas court held that the mere act of
Dr. Gilmartin agreeing to see the patient at a later time did not establish the
physician-patient relationship.  The
court reasoned that:

This case,
to a large extent, boils down to public policy concerns.  The type of telephone conversation that took
place here takes place on a frequent basis in the medical profession and is
vital to the treatment of patients.  For
the courts to discourage such conversations is not to the patients= or the public=s best interests.

 








If Dr.
Isaac had made an appointment for Jackson but Jackson had not shown up and then
died a week or a month later, no physician-patient relationship would have been
established.  That is what occurred in
the New York case of Miller v. Sullivan.  The doctor told the decedent to come to his office right away,
but the decedent decided to wait until the afternoon to see the doctor.  He died while waiting to see the
doctor.  Here, Jackson died before going
to Dr. Isaac=s office for the appointment.  Dr. Isaac did not see Jackson, did not
diagnose Jackson, and did not give any medical advice concerning treatment.

The doctor
in Ortiz consented to the physician-patient relationship; however, the
patient died before the doctor could get to the hospital to diagnose and treat
him.  The Ortiz court held that
no physician-patient relationship was established because the doctor had taken
no Aaffirmative action toward treatment of the
patient.@ 
Ortiz v. Shah, supra at 611.

Appellants
cite Lection v. Dyll, 65 S.W.3d 696 (Tex.App. B Dallas 2001, pet=n filed), where the Dallas court found that Dr. Dyll, a neurologist,
assumed a duty to the patient because he took some affirmative action to treat
the patient.  The court pointed out that
Dr. Dyll was the on-call physician and that he made a diagnosis of the
patient.  After listening to the
emergency room doctor, Dr. Syed, explain Lection=s symptoms, Dr. Dyll told Dr. Syed that Lection had a hemiplegic
migraine, that Ano further treatment needed to be done for
this patient at the time,@ and that it was alright for the patient to go home.  Dr. Dyll told Dr. Syed to Ajust have her come back to [Dyll=s] office on Monday.@ 
Before the Monday appointment with Dr. Dyll, the patient suffered a
disabling stroke.

We are
aware of the following language in St. John v. Pope, supra at 424:

It is only with a physician=s consent, whether express or implied, that
the doctor-patient relationship comes into being.  Thus we agree with those cases that hold that the duty to treat
the patient with proper professional skill flows from the consensual
relationship between the patient and physician.

 

The St. John court
had before it a case where the doctor evaluated the patient and then concluded
that he should not treat the patient. 
The supreme court noted:

St. John=s affidavit testimony that he never agreed to treat Pope is
clear, positive, direct, and easily controvertible.  If any agreement existed which divested St. John of the
discretion to choose whether to treat a patient, it was incumbent on
Pope to present it in order to preclude summary judgment for the doctor.
(Emphasis added) 

 

St. John v. Pope, supra
at 424.








Here, Dr.
Isaac agreed to see Jackson and then evaluate him but never had an opportunity
to do so.  Although the supreme court
discussed the physician-patient relationship in consensual terms, a physician=s agreement to see a new patient should not
by itself establish the physician-patient relationship.   After evaluating Jackson, Dr. Isaac might
have concluded that he was not the appropriate physician to treat Jackson, just
as the doctor did in St. John. 
To hold that there was a physician-patient relationship imposing a duty
on Dr. Isaac prior to the Monday appointment would significantly extend the
duty of a physician where the physician has had no previous contact with a
patient.  This we decline to do.

The
scheduling of an echocardiogram was the scheduling of a procedure to allow Dr.
Isaac to evaluate and diagnose Jackson. 
Scheduling the appointment and the diagnostic procedure did not rise to
an affirmative act of treatment that established the physician-patient
relationship for creating a duty.  Dr.
Isaac simply agreed to see Jackson if Jackson came to his office on Monday.  If a person calls a new doctor to schedule a
physical exam and the doctor=s office schedules that potential patient for an EKG and blood tests,
there has been no affirmative act to treat the patient by the mere fact that
the doctor=s office has scheduled the appointment and
the tests. 

Doctors
frequently refer their patients to medical specialists who have a certain
medical expertise.  We hold that the
mere scheduling of a diagnostic procedure and an appointment by a medical
specialist or his staff does not create a physician-patient relationship.  The trial court did not err if it based its
summary judgment on a finding that there was no physician-patient relationship
between Dr. Isaac and Jackson that created a duty to act on the part of Dr.
Isaac.

This
Court=s Ruling

We affirm the summary
judgment of the trial court.

 

TERRY McCALL

JUSTICE

 

April 18, 2002

Publish. 
See TEX.R.APP.P. 47.3(b).

Panel consists of: Arnot, C.J., and McCall, J., and McCloud, S.J.[1]











[1]Austin McCloud, Retired Chief Justice, Court of
Appeals, 11th District of Texas at Eastland sitting by assignment.